**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| YALE UNIVERSITY,<br>    Plaintiff, | : |
| | : |
| | :       Case No.:  3:09-CV-00466 (AWT) |
| and | : |
| | : |
| *THE NIGHT CAFÉ*, a PAINTING,<br>    Plaintiff-in-rem, | : |
| | : |
| | : |
| v. | : |
| | : |
| PIERRE KONOWALOFF,<br>    Defendant, | : |
| | : |
| v. | : |
| | : |
| YALE UNIVERSITY,<br>    Counter-Defendant, | : |
| | : |
| and | : |
| | : |
| *THE NIGHT CAFÉ*, a PAINTING,<br>    Counter-Defendant-in-rem. | :       July 30, 2009 |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS COUNTERCLAIMS**
**BY PLAINTIFF-COUNTERCLAIM DEFENDANT YALE UNIVERSITY**

# TABLE OF CONTENTS

                                                                                        **Page**

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................ 3

ARGUMENT ..................................................................................................... 9

I.      Three independent fatal flaws require dismissal of all of the counterclaims.................. 9

        A.      Statutes of limitation bar the counterclaims........................................ 9

                1.      *Conversion and Replevin* ............................................ 10

                2.      *Statutory theft*........................................................... 15

                3.      *Declaratory judgment and quiet title claims* ............. 16

                4.      *CUTPA* .....................................................................17

                5.      *No tolling doctrine forestalls the statute of limitations* ............ 19

        B.      The Act of State doctrine bars all of the counterclaims...................... 24

        C.      Russia's nationalization did not violate international law .................. 32

II.     Certain counts have additional infirmities beyond the three fatal flaws........................ 40

        A.      All claims except conversion and replevin must be dismissed............ 40

        B.      Konowaloff fails to state a CUTPA claim and lacks standing to bring one ....... 42

        C.      Konowaloff fails to state a claim for statutory theft ........................... 45

CONCLUSION.................................................................................................. 47

# TABLE OF AUTHORITIES

## CASES

*389 Orange St. Partners v. Arnold*, 179 F.3d 656 (9th Cir. 1999) ................................20

*Agudas Chasidei Chabad v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008)..................29, 40

*Agudas Chasidei Chabad v. Russian Federation*, Case No. 1:05-CV-01548-RCL (D.C. Cir. 2009) ........................................................................................................29

*Angrave v. Oates*, No. CV040352012, 2004 WL 2595855 (Conn. Super. Ct. Oct. 15, 2004) ......................................................................................................41

*Arawana Mills Co. v United Technologies Corp.*, 795 F. Supp. 1238 (D. Conn. 1992) ..............45

*AroChem International, Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992) ............................9

*Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937 (2009)..................................43, 45, 46, 47

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ............................... *passim*

*Bank Tejarat v. VarshoSaz*, 723 F. Supp. 516 (C.D. Cal. 1989) ...............................33

*Bartone v. Robert L. Day Co.*, 232 Conn. 527 (1995) ......................................19

*Baxter v. Sturm, Ruger & Co.*, 13 F.3d 40 (2d Cir. 1993) ...................................9

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) ............................43, 46

*Bellemare v. Wachovia Mortgage Corp.*, 94 Conn. App. 593 (2006) ..........................24

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2001)...................................27, 29

*Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000)................................29

*Brandewiede v. Emery Worldwide*, 890 F. Supp. 79 (D. Conn. 1994) ..........................45

*Burgos v. National Automobile Broker*, 5 Conn. L. Rptr. 63, 1991 WL 204356 (Conn. Super. Sept. 30, 1991)........................................................................41

*Brass v. America Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ......................5

*Caminis v. Troy*, 112 Conn. App. 546 (2009)...........................................17

*Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704 (2d Cir. 2002)..............................10

*Cassirer v. Spain*, 461 F. Supp. 2d 1157 (C.D. Cal. 2006)...................................................33, 39

*Cerbone v. ILGWU*, 768 F.2d 45 (2d Cir. 1985) ...........................................................22

*Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383 (2008)..................15, 45

*Chernick v. Johnston*, 100 Conn. App. 276 (2007) ........................................................15

*Chien v. Skystar Bio Pharmaceutical Co.*, No. 3:09CV149 (MRK), 2009 WL 1606451
    (D. Conn. June 8, 2009)........................................................................................21

*Connecticut Pipe Trades Health Fund v. Philip Morris, Inc.*, 153 F. Supp. 2d 101 (D.
    Conn. 2001)...................................................................................................42

*Connell v. Colwell*, 214 Conn. 242 (1990) ...........................................................19, 23

*Cornelio v. Stamford Hospital*, 246 Conn. 45 (1998)......................................................41

*Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107 (D. Conn. 1998).....................44

*Credit Suisse v. U.S. District Court*, 130 F.3d 1342 (9th Cir. 1997)...................................25

*D'Occhio v. Connecticut Real Estate Commission*, 189 Conn. 162 (1983) .............................9, 24

*De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir. 1985).........................33, 34

*DeLeo v. Nusbaum*, 263 Conn. 588 (1988) ..............................................................23

*Delocque-Fourcaud v. Los Angeles County Museum*, No. 03-cv-05027-R-CT (C.D. Cal.
    2003) ........................................................................................................29

*Deming v. Nationwide Mutual Insurance Co.*, 279 Conn. 745 (2006) ..................................15

*Discover Leasing, Inc. v. Murphy*, 33 Conn. App. 303 (1993).........................................25

*Dreyfus v. Von Finck*, 534 F.2d 24 (2d Cir. 1976), *cert. denied*, 429 U.S. 835 (1976)..........36, 39

*F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481 (S.D.N.Y. 1966), *aff'd mem.*, 375
    F.2d 1011 (2d Cir.), *cert. denied*, 389 U.S. 830 (1967)..............................................33

*Falker v. Samperi*, 190 Conn. 412 (1983) .............................................................25

*Fichera v. Mine Hill Corp.*, 207 Conn. 204 (1988) ...............................................*passim*

*Fogade v. ENB Revocable Trust*, 263 F.3d 1274 (11th Cir. 2001).....................................33

*Frontier Group, Inc. v. Northwest Drafting & Design, Inc.*, 493 F. Supp. 2d 291 (D. Conn. 2007)..................................................................................................15

*Gallop v. Comm'l Painting Co.*, 42 Conn. Supp. 187 (1992)........................................22, 23

*Giglio v. Connecticut Light and Power Co.*, 180 Conn. 230 (1981) ...............................24

*Goldstar (Panama) S.A. v. United States*, 967 F.2d 965 (4th Cir. 1992)........................37

*Guinto v. Marcos*, 654 F. Supp. 276 (S.D. Cal. 1986).....................................................34

*Handler v. Remington Arms Co.*, 144 Conn. 316 (1957)..................................................24

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)..........................................................20

*Head Money Cases*, 112 U.S. 580 (1884)..........................................................................37

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20 (2000)........................................45

*Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977), *cert. denied*, 434 U.S. 984 (1977) ...........25

*Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705 (1993)......................................................42

*Jafari v. Islamic Rep. of Iran*, 539 F. Supp. 209 (N.D. Ill. 1982)....................................34

*Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941) .........................9

*Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291 (2004) ....................................10

*Lambert v. Stovell*, 205 Conn. 1 (1987) ..............................................................................9

*Lawrence v. Richman Group Capital Corp.*, 358 F. Supp. 2d 29 (D. Conn. 2005) ..........15

*Linahan v. Linahan*, 131 Conn. 307 (1944)) .....................................................................22

*Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407 *cert. denied*, 209 Conn. 809 (1988) ....10, 12, 14

*M. Itzkowitz & Sons, Inc. v. Santorelli*, 128 Conn. 195 (1941) .......................................25

*Macomber v. Travelers Property & Casualty Corp.*, 261 Conn. 620 (2002) ....................42

*Maroun v. Tarro*, 35 Conn. App. 391 *cert. denied*, 231 Conn. 926 (1994)......................11

*Martinelli v. Fusi*, 290 Conn. 347 (2009) ..........................................................................23

iv

*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486 (2006) ................................................................................................44

*McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558 (1984) ...............................42

*In re Methyl Teriary Butyl Ether (MTBE) Products Liability Litigation*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005) ..................................................................................................42

*Modis, Inc. v. Bardelli*, 531 F. Supp. 314 (D. Conn. 2008) .....................................10

*Mora v. New York*, 524 F.3d 183 (2d Cir. 2008) .......................................................37

*Morris v. Costa*, 174 Conn. 592 (1978) .....................................................................22

*Mountaindale Condominium Association, Inc. v. Zappone*, 59 Conn. App. 311 (2000).............20

*Mystic Color Laboratory, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408 (2007) ..................45

*Nickerson v. Martin*, 34 Conn. Supp. 22 (Conn. Super. Ct. 1976) ...............................15

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) ............................................26, 36

*Olsen v. Pratt & Whitney Aircraft, Division of United Technologies Corp.*, 136 F.3d 273 (2d Cir. 1998).........................................................................................................20

*PJM and Associates, LC v. City of Bridgeport*, 292 Conn. 125, 2009 WL 1564387 (June 16, 2009) ..............................................................................................................41

*Pet Car Products, Inc. v. Barnett*, 150 Conn. 42 (1962) ...........................................22

*Plikus v. Plikus*, 26 Conn. App. 174, 599 A.2d 392 (1991)...........................................10

*Pottinger v. Pottinger*, No. CV0072320S, 2001 WL 1285387 (Conn. Super. Ct. Oct. 10, 2001) ........................................................................................................................17

*Presbyterian Church of Sudan v. Talisman Energy*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003), *appeal pending* No. 07-0016 (2d Cir. argued Jan. 12, 2009) .........................33

*Rapuano v. Rapuano*, No. CV010278120, 2001 WL 1332431 (Conn. Super. Ct. Oct. 12, 20011) ......................................................................................................................41

*Reinke v. Greenwich Hospital Association*, 175 Conn. 24, 392 A.2d 966 (1978).......................22

*Republic of the Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) ............................29

*Ricaud v. America Metal Co.*, 246 U.S. 304 (1918) ..................................................27

*Riverside Millwork Co., Inc. v. Pahl*, No. CV030521129S, 2006 WL 224174 (Conn. Super. Ct. Jan. 6, 2006)..................................................................................16

*Rong v. Liaoning Provincial Government*, 362 F. Supp. 2d 83 (D.D.C. 2005), *aff'd* 452 F.3d 883 (D.C. Cir. 2006)..................................................................30, 33

*Rosenfeld v. Rogin*, 69 Conn. App. 151 (2002) ...........................................................24

*Rosenthal v. Ford Motor Co., Inc.*, 462 F. Supp. 2d 296 (D. Conn. 2006) ....................43

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ..............................................................5

*Rweyamamu v. Cote*, 520 F.3d 198 (2d Cir. 2008).........................................................3

*Salimoff v. Standard Oil Co.*, 262 N.Y. 220, 186 N.E. 679 (1933) ..........................27, 34

*Slekis v. National R.R. Passenger Corp.*, 56 F. Supp. 2d 202 (D. Conn. 1999)..............10

*Stroganoff Scherbatoff v. Weldon*, 420 F. Supp. 18 (S.D.N.Y. 1976) ...........................31

*Stuart & Sons, L.P. v. Curtis Public Co., Inc.*, 456 F. Supp. 2d 336 (D. Conn. 2006)......... *passim*

*Suarez-Negrete v. Trotta*, 47 Conn. App. 517 (1998)................................................10, 15

*Sullivan v. Delisa*, 101 Conn. App. 605 (2007) ...........................................................15

*Tachiona v. Mugame*, 234 F. Supp. 2d 401 (S.D.N.Y. 2002).........................................33

*Town of Orangetown v. Gorsuch*, 718 F.2d 29 (2d Cir. 1983) ......................................17

*United States v. Belmont*, 85 F.2d 542 (2d Cir. 1936), *rev'd* 301 U.S. 324 (1937).......26

*United States v. Belmont*, 301 U.S. 324 (1937) .............................................25, 26, 34, 35

*United States v. Pink*, 315 U.S. 203 (1942) .....................................................25, 26, 35

*Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105 (2005) ..........................................44

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International*, 493 U.S. 400 (1990)...............................................................................................25

*Wasmer v. Fabricating & Production Machinery Inc.*, No. CV 91 28 10 76, 1991 WL 83999 (Conn. Super. Ct. Apr. 19, 1991)..................................................42

*Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.*, No.: 105575/00, 2001 WL 1657237 (N.Y. Sup. Sept. 28, 2001).......................................................25

vi

*Williams v. Walsh*, 558 F.2d 667 (2d Cir. 1977)...................................................16

*Yeomans v. Wallace*, 291 F. Supp. 2d 70 (D. Conn. 2003).................................10

## STATUTES AND RULES

22 U.S.C. § 2370(e)(2).............................................................................32

Fed. R. Civ. P. 8(b)(6)...........................................................................4, 8

Fed. R. Civ. P. 9(b)................................................................................20

Fed. R. Civ. P. 11..................................................................................19

Conn. Gen. Stat. § 1-2z............................................................................41

Conn. Gen. Stat. § 42-110g.........................................................................17

Conn. Gen. Stat. § 42a-2-403.......................................................................25

Conn. Gen. Stat. § 47-31........................................................................17, 25

Conn. Gen. Stat. § 52-515..........................................................................41

Conn. Gen. Stat. § 52-522..........................................................................41

Conn. Gen. Stat. § 52-577..........................................................9, 10, 15, 17, 24

Conn. Gen. Stat. § 52-595..........................................................................20

## INTERNATIONAL TREATIES

1907 Hague Convention ......................................................................*passim*

1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit
Import, Export and Transfer of Ownership of Cultural Property ..........................39

Geneva Convention...............................................................................38

Geneva Convention Relative to the Protection of Civilian Persons in Time Of War, Aug.
12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287, art. 3 .........................................38

International Committee of the Red Cross, Commentary, IV Geneva Convention Relative
to the Protection of Civilian Persons in Time of War 26-29 (J. S. Pictet, ed., 1958)..............38

## FOREIGN LAW

*Prince Dabischa-Kotromaiez v. Société Lepke*, Tribunal of Berlin, Nov. 1, 1928, 56 Clunet 184, 184-85 (1929) (Ger.) .................................................................32

*Princess Paley Olga v. Weisz*, 1 K.B. 718, 725 (King's Bench, 1929) .........................31

*Prosecutor v. Dusko Tadic*, Case No. IT-94-1, Decision of Defence [sic] Motion for Interlocutory Appeal on Jurisdiction of Oct. 2, 1995 *available at* http://www.icty.org/x/cases/tadic/acdec/en/51002.htm .................................37, 38

Russian Nationalization Decree of December 19, 1918 ........................................*passim*

## OTHER LEGAL SOURCES

*William H. Reeves, The Act of State Foreign Decisions Cited in the* Sabbatino *Case*, 33 Fordham L. Rev. 599, 669 (1964-65) ...........................................................32

Restatement (Third) of the Foreign Relations Law of the United States § 205(3) (1987) ...........27

Restatement (Third) of Foreign Relations § 712 (1987)...........................................33

*Connecticut Unfair Trade Practices*, in 12 CONNECTICUT PRACTICE SERIES, § 6.3 (2003 & Supp. 2008).................................................................................43

## OTHER NON-LEGAL SOURCES

43 *Magazine of Art* 1, 286 (1950) ...............................................................6

*A Collector's Taste: Selections from the Collection of Mr. and Mrs. Stephen C. Clark* (1954).................................................................................4

*The Art Journal* (Winter 1961-62)...............................................................5

*Art Quarterly* (1961) .......................................................................5, 13

*Gazette des Beaux-Arts* (February 1962)......................................................5, 13

*Yale Art Gallery Bulletin* (December 1962) .....................................................13

*Morozov and Shchukin, the Russian Collectors (1993)*............................................7

*Art in Our Time* (1939) ........................................................................4

K. Akinsha and G. Kozlov, Fighting for Their Rights, *ArtNews* (April 2008), *available at* http://www.artnews.com/issues/article.asp?art_id=2474 .................................28

Jean-Francois Barrielle, *La Vie et l'oeuvre de Vincent van Gogh* (1984) ....................................5

Jean-Paul Clebert et Pierre Richard, *La Provence de van Gogh* 32 (Aix-en-Provence: 1981) ....................................6

Raymond Cogniat, *French Painting at the Time of the Impressionists* 113 (1951) ....................6

Francoise Forster-Hahn, *French and School of Paris Paintings in the Yale University Art Gallery* (1968) ....................................6

Jan Greenberg & Sandra Jordan, *Vincent van Gogh: Portrait of an Artist* 76 (2003) ....................7

Robert Hughes, *Les Essentiels de L'Art: Van Gogh* 420-421 (2002) ....................................7

Edward A. Jewell, *Vincent Van Gogh* 32 (1946) ....................................6

Edward A. Jewell & Aimée Crane, *French Impressionists and Their Contemporaries Represented in American Collections* 186 (1944) ....................................6

Genevieve Lacambre et al., *L'Art du XIXe siècle, 1850-1915* 74, 140 (Paris, 1990) ....................6

Jean Leymarie, *Van Gogh* 96 (1951) ....................................6

Sophie Monneret, *L'impressionnisme et son époque: dictionnaire international illustré* (1978) ....................................6

Carl Nordenfalk, *The Life and Work of van Gogh* 206 & plate 45 (1953) ....................................6

Gerhard Werle & Florian Jessberger, *Principles of International Criminal Law* 336 (Cambridge Univ. Press 2005) ....................................38

Bernard Zurcher, *Vincent Van Gogh: Art, Life and Letters* 166 (1985) ....................................7

# INTRODUCTION

*The Night Café* is a world-famous painting by Vincent van Gogh, displayed at the Yale University Art Gallery since an alumnus bequeathed it to Yale nearly fifty years ago. Pierre Konowaloff, a French citizen, claims to be the heir of Ivan Morozov, a Russian aristocrat and industrialist who last possessed the painting ninety-one years ago. In 1918, after its October Revolution, Russia promulgated decrees confiscating much private property, including real estate, factories, and the collections of several art collectors, including Morozov.

Konowaloff claims that Russia's taking of the painting without compensation violated international law, but he does not sue Russia. Instead, he claims that Russia's failure to pay Morozov compensation means that Morozov still owned *The Night Café* when he died in 1921, and Konowaloff is Morozov's heir, the painting is his. He brings conversion and related claims, asking this Court to pull the painting from the museum's walls and give it to him – or to give him its cash value.

His claims have three fatal flaws, each of which requires their dismissal.

First, they are time-barred. Konowaloff alleges wrongs from almost a century ago. At the latest, the statute of limitations on his claims expired in the mid-1960s, three years after Yale received the painting and publicly accessioned it into the Yale University Art Gallery collection.

Second, Konowaloff has no right to ask this Court to adjudicate the legality of Russia's decree in 1918. He rests all of his claims on the presumption that the taking by Russia violated international law: Russia's violation of international law impaired the title to the painting, he claims, so Stephen Clark, who bequeathed the painting to Yale, never owned it. But he cannot prove that the Russian decree violated international law. The Act of State doctrine precludes Konowaloff from mounting a legal challenge to the validity of Russia's decree in U.S. courts. In

fact, the Supreme Court has repeatedly rejected efforts to force U.S. courts to review communist takings – including those that took place pursuant to Russian decrees in 1918 – taking place within their own borders.

Third, even if it were permissible for the Court to adjudicate the decree's validity, it is well-established that a foreign nation's taking of its own national's property within its own borders does not violate international law. Takings without compensation certainly violate American constitutional norms and values. But that does not mean that they violated international law. Konowaloff would have this Court transform established American constitutional norms into a novel rule of international law, and then impose that new rule retroactively on what happened in Moscow in 1918.

While several of his claims have additional fatal flaws, all of them share at least those first three: they come too late, ask this Court to pass judgment on foreign affairs, and in any event have no foundation in international law. At bottom, Konowaloff offers only historical arguments, not cognizable legal claims.

## STATEMENT OF FACTS[1]

*The Night Café* (the "Painting") is one of the most renowned paintings in the world. Compl. ¶ 2; Answer ¶ 2.[2]  It permanently resides at the Yale University Art Gallery in New Haven, Connecticut.  Compl. ¶ 8; Answer ¶ 8.  For the entire period of the Painting's display at Yale, a didactic stating "Bequest of Stephen Carlton Clark, B.A. 1903" has remained on the wall next to the Painting.  Compl. ¶¶ 31, 32; Answer ¶¶ 31, 32.

Nearly a century ago, in 1918, Ivan Morozov, a Russian industrialist and aristocrat, owned the Painting.  Compl. ¶ 3; Answer ¶ 3.  Like the property of other Russians, Ivan Morozov's property – factories, real estate, paintings – was taken by the Russian government in the wake of that country's October 17 communist revolution.  *Id.*  Those takings followed the establishment of the Russian Socialist Federated Soviet Republic ("RSFSR") on November 7, 1917.  Compl. ¶ 64; Answer ¶ 64.  On December 19, 1918, the RSFSR issued a decree ("Decree") declaring the art collections of three Russian citizens, including Ivan Morozov, to be state property.  Compl. ¶¶ 67, 68; Answer ¶¶ 67, 68.  Morozov's collection included *The Night Café*.  Compl. ¶ 67; Answer ¶ 67.  In 1922, the RSFSR joined with three other republics to form the Union of Soviet Socialist Republics ("USSR" or "Soviet Union").  Compl. ¶ 73; Answer ¶ 73.  The United States recognized the USSR for decades before it dissolved, and now recognizes the Russian Federation.  Compl. ¶ 80; Answer ¶ 80.  Russia continues to possess and display many art works that were taken from Morozov via the Decree.  Compl. ¶ 81; Answer ¶ 81.  As recently as December 2007, in response to a threat of legal action made by Defendant

---

[1] Konowaloff has alleged or admitted all of the facts set forth here.  *Cf. Rweyamamu v. Cote*, 520 F.3d 198, 200 (2d Cir. 2008) (allegations must be presumed true on motion to dismiss).

[2] The Counterclaim "incorporates in pertinent part all the admissions and demands made in Mr. Konowaloff's answer to Yale's Complaint . . . ."  Counterclaim ¶ 1.

3

Konowaloff to seek former Morozov paintings that Russia was about to loan to an English museum, Russia took diplomatic action to protect the paintings. Compl. ¶ 82; Answer ¶ 82.

The Soviet Union displayed *The Night Café* in the Museum of Modern Western Art in Moscow until 1933, then sold it. Compl. ¶ 75; Answer ¶ 75. Later that year, through a series of transactions with art galleries in Berlin and New York, Stephen Clark acquired the Painting. Compl. ¶¶ 57, 63, 75; Answer ¶¶ 57, 63, 75; *see also* Counterclaim ¶¶ 5, 28 (Painting purchased in 1933). Clark openly displayed *The Night Café* in prominent exhibitions at some of the most famous museums and galleries in the United States, including the Museum of Modern Art, the Art Institute of Chicago, the Philadelphia Museum of Art, the Metropolitan Museum of Art, the Knoedler Gallery, the Museum of Fine Arts-Boston, the Cleveland Museum of Art, and the Detroit Institute of Art. Compl. ¶¶ 58-61; Answer ¶¶ 58-61.[3] The 1939 exhibition "Art in Our Time" at the Museum of Modern Art listed Clark "as the owner of the Painting," and the exhibition catalogue reproduced the picture "with the caption 'Lent by Stephen C. Clark, New York.'" Compl. ¶ 59; Answer ¶ 59; *see also* Exh. A-28. The "Art in Our Time" exhibition at the Museum of Modern Art was so famous that on opening night, Lowell Thomas hosted a national radio show focusing on the exhibition, with commentary by President Roosevelt, Walt Disney and Edsel Ford. *Id.*

The Painting continued to be prominently displayed – with Clark's name attached to it, and with provenance information as well. In 1954, the Knoedler Gallery mounted an exhibition in New York entitled "A Collector's Taste: Selections from the Collection of Mr. and Mrs. Stephen C. Clark," in which *The Night Café* was displayed. Compl. ¶ 60; Answer ¶ 60; *see also*

---

[3] Konowaloff sometimes chooses not to respond to a factual allegation in the complaint, and thus admits it. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied.").

Exh. A-32 at 3 (listing previous owners as "Madam J. Van Gogh-Bonger, Amsterdam; purchased at the Toison d'Or Exhibition by I.A. Morosoff, Esq.; The Museum of Modern Western Art of Moscow").

After Clark died and bequeathed the Painting to Yale, *The Art Journal*, a widely read arts publication, reported on Clark's bequest and Yale's display of it in an article entitled "Yale Exhibits Clark Bequest."   Compl. ¶ 34; Answer ¶ 34; *see also* Exh. A-1.[4]   The article, published in the Winter, 1961-1962 edition, referred to the Painting as "the world-famous Night Café by van Gogh, 1888, formerly in the Museum of Modern Western Art, Moscow."  *Id.*  Publication of Yale's accession of the Painting was also reported by *Art Quarterly* in a 1961 article on "Accessions of American and Canadian Museums."  Compl. ¶ 35; Answer ¶ 35-49; *see also* Exh. A-2.[5]

The news also spread in France: in February 1961, the *Gazette des Beaux-Arts* published a reproduction of the Painting to accompany an article entitled "La Chronique des Arts," along with a caption reading "Yale University Art Gallery, New Haven (legs Stephen Carlton Clark, '03)."  Compl. ¶ 36; Answer ¶ 35-49; *see also* Exh. A-3.  *See generally* Compl. ¶¶ 34-49; Answer ¶¶ 34-49.  In fact, French books repeatedly described the Painting as belonging to Yale.

---

[4] Konowaloff admits that *The Art Journal* article was published "and refer[s] to the article for a full and complete recitation of its contents."  Answer ¶ 34. The Court can consider the content of the article without converting this motion to one for summary judgment because Konowaloff has incorporated it.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6).  Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered."); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (in ruling on motion to dismiss, a court may consider "documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice may be taken or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit").

[5] Konowaloff admits "that the articles referenced were published in the publications referenced and refer[s] to those publications and articles for a full and complete recitation of their contents . . . ."  Answer ¶¶ 35-49.

In 1978, a book by Sophie Monneret published in Paris, *L'impressionnisme et son époque/3*, part of the *Dictionnaire international illustré*, reproduced the Painting with a caption reading "Yale University Art Gallery, legs Stephen C. Clark New Haven (photo du musée)." Compl. ¶ 49; Answer ¶ 35-49; *see also* Exh. A-15.  In 1984, also in Paris, Jean-Francois Barrielle published *La vie et l'oeuvre de Vincent Van Gogh*, which reproduced the Painting, accompanied by a caption stating "Yale University Art Gallery, New Haven.  Donation S. Carlton Clarke."  Compl. ¶ 49; Answer ¶ 35-49; *see also* Exh. A-18.[6]

Publications described not just the bequest of the Painting to Yale and its accession into Yale's collection – but also its provenance, including the fact that Morozov had owned it decades earlier.  Compl. ¶¶ 35-49; Answer ¶¶ 35-49.  For instance, in Francoise Forster-Hahn's 1968 book, *French and School of Paris Paintings in the Yale University Art Gallery*, the Painting's provenance is described at page 11 as follows: "Provenance: Mme J. van Gogh-Bonger, Amsterdam; J.A. Morosov, Moscow (acquired at the *Exhibition of the Golden Fleece*, Moscow, 1908; Museum of Modern [Western] Art, Moscow; Stephen C. Clark, New York," and describes

---

[6] Others include Jean-Paul Clebert et Pierre Richard, *La Provence de van Gogh* 32 (Aix-en-Provence: 1981) and Genevieve Lacambre et al., *L'Art du XIXe siècle, 1850-1915* 74, 140 (Paris, 1990). Compl. ¶ 49; Answer ¶ 35-49; *see also* Exhs. A-17, A-24.  French publications had also reported on Clark's ownership.  *See e.g.*, Jean Leymarie, *Van Gogh* 96 (1951) (reproducing Painting with title and caption "Collection Stephen C. Clark, New-York") (published in French); Raymond Cogniat, *French Painting at the Time of the Impressionists* 113 (1951) (reproducing Painting with title and caption "New York, Stephen C. Clark Collection") (translated from French publication).  For examples of other publications reporting on Clark's ownership of the Painting, see Edward A. Jewell & Aimée Crane, *French Impressionists and Their Contemporaries Represented in American Collections* 186 (1944) (reproducing Painting with title and caption "Collection of Stephen C. Clark, New York); Edward A. Jewell, *Vincent Van Gogh* 32 (1946) (reproducing Painting with title and caption "Collection Stephen C. Clark, New York"); 43 *Magazine of Art* 1, 286 (1950) (reproducing Painting with title and caption "collection Stephen C. Clark, New York, courtesy Museum of Modern Art"); Carl Nordenfalk, *The Life and Work of van Gogh* 206 & plate 45 (1953) (reproducing Painting with title and caption "Stephen C. Clark Collection, New York").

Yale's ownership as having occurred through the "Bequest of Stephen C. Clark, B.A. 1903,"

even listing the accession number for the Painting.  Compl. ¶¶ 39; Answer ¶¶ 35-49; *see also*

Exh. A-5.[7]  Similarly, the 1993 book *Morozov and Shchukin – the Russian Collectors*, describes

the Painting's provenance this way: "*Provenance:* Mme Johanna Van Gogh-Bonger; 1907

Galerie Bernheim-Jeune, Paris; from 1908 I.A. Morozov Collection; from 1918 Second Museum

of Modern Western Painting; from 1923 State Museum of Modern Western Art; Spring 1933

Galerie Knoedler, New York; from 1933 or 1934 Stephen C. Clark Collection, New York; from

1961 Yale University Art Gallery, New Haven (Stephen C. Clark Bequest)."  Exh. A-14

(excerpts from versions of the book in English, German and Russian); *see* Compl. ¶ 78; Answer

¶ 78.[8]  The book even mentions Morozov's former ownership in the caption next to its

reproduction of the Painting, stating: "Yale University Art Gallery, New Haven  Inv. No.

1961.18.34  Stephen C. Clark Bequest, 1960 (formerly I.A. Morozov Collection)."  Exh. A-14 at

3; *see* Compl. ¶ 78; Answer ¶ 78.

---

[7] Konowaloff "admit[s] that the articles referenced were published in the publications referenced and refer[s] to those publications and articles for a full and complete recitation of their content . . . ." Answer ¶¶ 35-49.  Konowaloff asserts broadly a "proviso that in none of the cited publications was mention ever made of the Painting's provenance as part of the confiscated Morozov collection," *id.*, but that assertion is at odds with his admission that the Forster-Hahn book was published and his incorporation of its "full and complete" content.

[8] Konowaloff asserts that "[t]he only citation Yale makes to publication listing the Painting as in Yale's possession (1993) was printed in Russian and German and not ordinarily available to French citizens in France," *id.*, Answer ¶ 97, but he contradicts himself by admitting that many other publications describing Yale's ownership of the Painting were printed in English and French.  *See* Compl. ¶¶ 34-49; Answer ¶¶34-49.  For additional examples of publications describing Yale's ownership of the Painting, see Robert Hughes, *Les Essentiels de L'Art: Van Gogh* 420-421 (2002) (published in French) (reproducing Painting with title and caption "Yale University Art Gallery, New Haven."); Jan Greenberg & Sandra Jordan, *Vincent van Gogh: Portrait of an Artist* 76 (2003) (reproducing Painting with title and caption "Yale University Art Gallery. Bequest of Stephen Carlton Clark, B.A., 1903"); Bernard Zurcher, *Vincent Van Gogh: Art, Life and Letters* 166 (1985) (reproducing Painting with title and caption "Yale University Art Gallery, New Haven, Connecticut (Bequest of Stephen Carlton Clark)").

For years, Yale's ownership and possession of the Painting – as well as the fact that Yale received the Painting from Stephen Clark – has been widely reported on the Internet.  For instance, the "Vincent van Gogh Gallery," a website devoted to van Gogh's paintings, has reported since at least December 2005 that *The Night Café* is at Yale.  Compl. ¶ 50; Answer ¶ 50.[9]  In short, in the almost fifty years since Clark's bequest to Yale, the Painting has been repeatedly reproduced, with Yale identified as its owner.  Compl. ¶ 95; Answer ¶ 95.[10]

In 1993, Ivan Konowaloff, Pierre Konowaloff's father and predecessor-in-interest, filed suit in a French court, seeking an injunction impounding other paintings that Russia had nationalized from Morozov.  Compl. ¶ 87; Answer ¶ 87.  He did not succeed.  *Id.*  In January 2002, after his father and predecessor-in-interest had died, Pierre Konowaloff allegedly "undertook an exhaustive effort aimed at documenting the inventory of his great-grandfather [and predecessor-in-interest], Ivan Morozov."  Counterclaim ¶ 15. But in the ninety years since Morozov possessed *The Night Café*, neither Konowaloff nor his predecessors-in-interest tried to recover the Painting until he wrote Yale in 2008.  Compl. ¶¶ 90, 101; Answer ¶¶ 90, 101; Counterclaim ¶ 15.

---

[9]  Konowaloff does not deny that "[f]or years, Yale's ownership and possession of the Painting, as well as the fact that Yale received the Painting from Stephen Clark, has been widely reported on the Internet" or that "the 'Vincent van Gogh Gallery,' a website maintained at www.vggallery.com devoted to van Gogh's paintings, has reported since at least December 2005 that *The Night Café* is at the Yale University Art Gallery."  Compl. ¶ 50; Answer ¶ 50 (admitting non-responsively "that *Yale* has a website that has reported since 2005 that *The Night Café* is at the Yale University Art Gallery . . . .") (emphasis added).  *See* Fed. R. Civ. P. 8(b)(6) (allegation is admitted if not denied).

[10] Konowaloff does not deny this, choosing instead to make a legal argument: "[d]eny that the reproduction of the Painting constitutes any identification in a legal sense of Yale's ownership." Answer ¶ 95.  *See* Fed. R. Civ. P. 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied.").

## ARGUMENT

### I.     Three independent fatal flaws require dismissal of all of the counterclaims.

All of Konowaloff's counterclaims fail as a matter of law for each of three independent

reasons.  First, statutes of limitation bar the decades-old counterclaims.  Second, the Act of State

doctrine precludes adjudication of whether the Russian Decree violated international law, and all

of Konowaloff's counterclaims rest on his asserted invalidity of Russia's action.  Third, even if

the Act of State doctrine did not preclude adjudication of the validity of the Decree, Konowaloff

has failed to state a claim for any violation of international law by Russia that could impair

Yale's title.

#### A.     Statutes of limitation bar the counterclaims.

Konowaloff asserts all of his claims decades too late.  On the facts alleged or admitted by

Konowaloff, Yale has possessed the Painting for nearly half a century, and under well-settled

Connecticut law, the statute of limitations on each of the claims ran long ago.

Connecticut applies a three-year statute of limitations to nearly all torts.  C.G.S. § 52-577

("No action founded upon a tort shall be brought but within three years from the date of the act

or omission complained of."); *see also D'Occhio v. Connecticut Real Estate Commission*, 189

Conn. 162, 182 (1983) (statute of limitations for conversion is three years under C.G.S. § 52-

577); *Lambert v. Stovell*, 205 Conn. 1, 4 (1987) (three-year statute of limitations of § 52-577 "is

applicable to all tort actions other than those excepted therefrom by § 52-584 or other

sections.").[11]  Moreover, the three-year period within which tort actions may be brought begins

---

[11] A federal court sitting in diversity applies the choice-of-law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992); *see also* Compl. ¶ 10 (asserting diversity jurisdiction); Answer ¶ 10 (admitting same).  Connecticut choice-of-law rules require the application of Connecticut statutes of limitation.  *See Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335, 347

to run on the date of the alleged wrong underlying the claim – not on the date of the injury from

that alleged wrong, or the date of the accrual of the cause of action, or the date of the plaintiff's

discovery of the alleged wrong, or the date on which the plaintiff should have discovered the

alleged wrong. All that matters is "the date of the act or omission complained of." C.G.S. § 52-

577. As the Connecticut Supreme Court has held, "the history of that legislative choice of

language precludes any" other construction. *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212

(1988) (internal quotation marks omitted).

       1.    ***Conversion and Replevin.*** Conversion occurs when a defendant has done

"some unauthorized act which deprives another of his property permanently or for an indefinite

time. . . . The essence of the wrong is that the property rights of the plaintiff have been dealt with

in a manner adverse to him, inconsistent with his right of dominion and to his harm." *Label*

*Systems Corp. v. Aghamohammadi*, 270 Conn. 291, 329 (2004) (internal quotation marks and

citations omitted); *accord Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314, 321 (D. Conn. 2008).[12]

       Konowaloff alleges that Yale wrongfully possessed the Painting from the beginning.

"Clark never acquired lawful title, [and] he could not bequeath lawful title to Yale."

Counterclaim ¶ 6; *see id.* ¶ 28 ("Stephen C. Clark acquired the Painting in 1933 but did not

---

(1994) (Connecticut statutes of limitation apply in diversity action for all claims that existed at
common law), *on certification from Baxter v. Sturm, Ruger & Co.*, 13 F.3d 40 (2d Cir. 1993); *see
also Slekis v. National R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 204-05 (D. Conn. 1999). *Cf.
Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) ("in diversity cases state law
governs not only the limitations period but also the commencement of the limitations period").
[12] Conversion can occur when a defendant believes itself to own the property in question. *See
Plikus v. Plikus*, 26 Conn. App. 174, 180 (1991) (holding that conversion occurs when one
exercisees dominion "over property belonging to another, without authorization and to the
exclusion of the owner's rights . . . *even if one reasonably believes that the item is one's own*")
(emphasis added); *see also Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 409-12, *cert.
denied*, 209 Conn. 809 (1988) (defendant's mistaken belief that fixtures were its own property
did not prevent finding that conversion occurred); *Yeomans v. Wallace*, 291 F. Supp. 2d 70, 77
(D. Conn. 2003) (*citing Suarez-Negrete v. Trotta*, 47 Conn. App. 517, 521 (1998)).

obtain good title to it.  Yale obtained the Painting by a bequest from Mr. Clark and thus did not

obtain good title to it."); Compl. ¶¶ 34-37; Answer ¶¶ 34, 35-49 (admitting that news of bequest

was reported in 1961-62).[13]  Konowaloff avers that "Yale knew, or should have known, at the

time it received the bequest and thereafter that they [sic] unlawfully acquired the stolen

masterpiece," Counterclaim ¶ 18, and alleges that Yale's "acceptance of the Clark bequest," *id.* ¶

51, "amounted to 'art laundering' that involved the knowing receipt of stolen goods," *id.; see

also id.* ¶ 11 (alleging "Yale's deliberate acquisition of suspect stolen art").  Konowaloff claims

that Clark converted the Painting when he received it in 1933, and that Yale converted it when it

received Clark's bequest in 1961.  A straightforward application of the statute of limitations to

Konowaloff's claims makes plain that they expired in 1964 at the latest.

      The statute of limitations would have expired by the mid-1960's even if Konowaloff had

alleged that Yale's possession of the Painting was originally rightful.  A "second class of

conversion occurs when the possession is originally rightful, but becomes wrongful as a result

of: (1) a wrongful detention; (2) a wrongful use of the property; or (3) the exercise of

unauthorized dominion over the property." *Stuart & Sons, L.P. v. Curtis Pub. Co., Inc.*, 456 F.

Supp. 2d 336, 344 (D. Conn. 2006) (citation omitted); *see also Maroun v. Tarro*, 35 Conn. App.

391, 396, *cert. den.*, 231 Conn. 926 (1994).  Konowaloff has not alleged that Yale originally had

rightful possession.  But even if he had – for example, if he had alleged that Yale borrowed the

---

[13] Konowaloff alleges that Clark converted the Painting in 1933 or 1934.  *See* Counterclaim ¶ 5 (Clark "either had actual knowledge, or reasonably should have known, that Russia had no legal title to the Painting when he sought to acquire it in 1933."); Compl. ¶¶ 57-61; Answer ¶¶ 57-61 (admitting that Clark purchased the Painting in 1933 or 1934 and asserted his ownership of the Painting to the public at large).  If Clark converted the Painting in 1933 or 1934, then the statute of limitations on any action against Clark ran in 1936 or 1937; after that, Clark's title to the Painting could not be impugned.  Because Yale received Clark's title, no claim that the title to the Painting was flawed could have been brought against Yale at any time since Yale received it in 1961.

Painting from his predecessors-in-interest with their permission – then the Painting would have been converted when Clark or Yale "exercise[d] unauthorized dominion over the property" by publicly asserting ownership of the Painting. *See Stuart & Sons*, 456 F. Supp. 2d at 346; *see also Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 409-10 (1988).

In *Stuart & Sons*, the court considered defendants' counterclaims for ownership of several paintings by Norman Rockwell. The paintings had been in the possession of the plaintiff's father (Stuart, Sr.) for about forty years before the defendant claimed to own them. In ruling that the statute of limitations had run, the court noted that "Stuart, Sr. held himself out, and was publicly recognized as the owner of the Paintings in numerous publications, including books about Rockwell and gallery and museum catalogues." *See Stuart & Sons*, 456 F. Supp. 2d at 341. It noted also that the Norman Rockwell Museum, to whom Stuart, Sr. lent the paintings, "ha[d] always identified the Paintings as the property of the Stuart family, both at the Museum and on its web site." *Id.* By holding himself out as the owner of the paintings in numerous publications, including books and catalogues, Stuart, Sr. had acted inconsistently with the alleged bailment; he had asserted dominion over the paintings, and so converted them if they were not already his. *Id.* at 346 ("the statute of limitations began to run on the date that Stuart, Sr. first publicly asserted his ownership of the Paintings," in a book on Norman Rockwell where "Stuart, Sr. is listed as the owner of 'Saying Grace' and 'Walking to Church.'").

Konowaloff admits that Yale has publicly asserted its ownership of the Painting. He admits that Yale "proudly spread the news of the bequest" of the Painting after receiving it in 1961. Compl. ¶ 37; Answer ¶ 37. He admits that the wall didactic next to the Painting reads "Bequest of Stephen Carlton Clark, B.A. 1903," and has so read "for the entire period of its display at Yale." Compl. ¶ 32; Answer ¶ 29-33. He admits that "the winter 1961-62 issue of the

12

*Art Journal*" reported Clark's bequest to Yale. Compl. ¶ 34; Answer ¶ 34.  He admits that in 1961 and 1962, publications in the United States and France reported on Clark's bequest of the Painting and Yale's accession of it, and that in the years since then many publications around the world have reported on Yale's ownership and display of the Painting.  Compl. ¶¶ 35-49 (describing articles in *Art Quarterly*, *Gazette des Beaux-Arts*, and the Yale University Art Gallery *Bulletin* reporting on the bequest and accession, and describing twenty-seven books reproducing the Painting and describing it as a bequest from Stephen Clark that is part of the Yale University Art Gallery collection); Answer ¶ 35-49 ("Admit that the articles referenced were published in the publications referenced and refer to those publications and articles for a full and complete recitation of their contents"); *see also* Compl. ¶¶ 31, 57-61, 78; Answer ¶¶ 31, 57-61, 78 (undisputed facts concerning Clark's assertion of ownership and exercise of dominion over the painting); Exhs. A-59-60.  In short, Konowaloff admits that Yale has publicly asserted ownership over the Painting for nearly half a century.  As in *Stuart & Sons*, the alleged conversion happened no later than those assertions of ownership – here the early 1960s – and the counterclaims for return of the Painting are thus time-barred.

The date when Konowaloff demanded that Yale give him the Painting has no bearing on the limitations analysis.  Konowaloff alleges that he first demanded the Painting's return in 2008 and that Yale did not return it.  *See* Counterclaim ¶¶ 47-48.  But under Connecticut law, a demand for the return of property matters only if the property has not already been converted.  If the possession of the property began as wrongful, or it became wrongful through unauthorized use or assertion of dominion over the property, then the demand is legally meaningless.  "Proof of the wrongful taking establishes the conversion; thus there is no need for a demand and a refusal for return of the property to establish the tort.  The statute of limitations begins to run on

13

the date the property was wrongfully taken." *Stuart & Sons, L.P. v. Curtis Pub. Co., Inc.*, 456 F. Supp. 2d 336, 344 (D. Conn. 2006) (internal citation omitted). "Connecticut law does not require demand and refusal for a conversion to occur when a possessor exercises a right of ownership to the exclusion of the [alleged] rightful owner . . . ." *Id.* at 347; *see also Luciani*, 15 Conn. App. at 410-411 ("wrongful use or dominion . . . change the character of the possession itself. Therefore, these actions, when taken by a possessor, constitute sufficient demarcation of a substantial change in the status of the relationship of the parties to each other, and to the property in question. Accordingly, the requirement of demand is unnecessary."). "[I]f they were intent on protecting their rights, real or imagined," Konowaloff and his predecessors-in-interest "were required to bring an action to recover their property within three years from the time" that Yale "exercised unauthorized dominion or control of the Paintings." *Stuart & Sons*, 456 F. Supp. 2d at 347. The fact that they "did not make a demand for the return of the Painting[]" until 2008 "is irrelevant." *Id.*

Nor does it matter that Konowaloff allegedly did not know that Yale had held out the Painting as its property for nearly fifty years. *See* Answer ¶¶ 96, 97; Fifth Affirmative Defense, at 15; Counterclaim ¶ 15. "Whether the rightful owner had actual knowledge of the conversion is of no consequence for purposes of the statute of limitations." *Stuart & Sons,* 456 F. Supp. 2d at 344; *see also id.* at 346 n. 14 ("Defendants' notice of the conversion is not required for the statute of limitations to begin to run."); *id.* at 346 ("[U]nder Connecticut law the Defendants' knowledge is unnecessary for the statute to begin to run[.]"); *id.* ("Connecticut does not adhere to the discovery rule to determine when the statute of limitations begins to run[.]"); *accord Fichera,*

14

207 Conn. at 212. In short, any alleged conversion occurred in 1961, when Yale both took possession of the Painting from Clark and asserted ownership of it.[14]

The analysis is no different for replevin. Konowaloff's replevin claim alleges that "Yale has wrongfully detained *The Night Café* from Mr. Konowaloff and continues to do so." Counterclaim ¶ 40. The replevin claim is thus premised upon the conversion claim. *Frontier Group, Inc. v. Northwest Drafting & Design, Inc.*, 493 F. Supp. 2d 291, 298-99 (D. Conn. 2007) (quoting *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770 (2006)); *see also Nickerson v. Martin*, 34 Conn. Supp. 22, 30 (Conn. Super. Ct. 1976) ("As the early case of *Mead v. Johnson*, 54 Conn. 317, 319 [1886], makes evident, (t)he action of replevin is founded in tort."). Like other torts, replevin claims must be brought within three years of the alleged wrong. C.G.S. § 52-577; *Fichera*, 207 Conn. at 212.

      2.     ***Statutory theft.*** If Konowaloff had stated a claim for statutory theft,[15] it would be time-barred. Statutory theft requires all of the elements of conversion, plus wrongful intent. *Suarez-Negrete v. Trotta*, 47 Conn. App. 517, 521 (1998) ("statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion."); *accord Sullivan v. Delisa*, 101 Conn. App. 605, 620 (2007); *Chernick v. Johnston*, 100 Conn. App. 276, 277 n.2 (2007). Where a party is alleged to have "knowingly receive[d] and conceale[d] stolen property" under § 52-564, the wrong occurs when the defendant knows that the property is stolen, and still conceals it. *See Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 409-410 (2008) (finding that latest date by which

---

[14] In any event, Konowaloff's conversion claim fails on the merits, since it is elemental that "conversion require[s] plaintiff's ownership of the claimed . . . converted property." *Lawrence v. Richman Group Capital Corp.*, 358 F. Supp. 2d 29, 41 (D. Conn. 2005). *See infra* Pt. I.B. (act of state doctrine requires giving effect to Russian nationalization decree); Pt. I.C. (Russian nationalization did not violate international law).

[15] He has not. *See infra* Pt. II.C.

defendant could have known that her husband had wrongfully appropriated property she retained was more than three years before suit was filed).

Yale received the Painting in 1961, and Konowaloff alleges that "Yale's unquestioned acceptance of the Clark bequest amounted to 'art laundering' that involved the knowing receipt of stolen goods." *See* Counterclaim ¶ 51.   The statute of limitations thus began to run on Konowaloff's claim for statutory theft in 1961, when Yale allegedly accepted the Painting in Clark's bequest with knowledge that it was "stolen" property.   This claim has thus been barred by the statute of limitations since 1964.

> **3.**   ***Declaratory judgment and quiet title claims.***  Konowaloff also seeks

declaratory relief and quiet title,[16] asserting that he "is the rightful owner of the Painting and that Yale is in wrongful possession of the Painting."   Counterclaim ¶ 33; *see also id.* ¶ 28 ("Clark acquired the Painting in 1933 but did not obtain good title to it.  Yale obtained the Painting by a bequest from Mr. Clark and thus did not obtain good title to it."); *id.,* ¶ 29 ("Mr. Konowaloff has requested that Yale return the Painting to him as the rightful owner of the Painting and Yale has refused."); *id.,* ¶¶ 34-35, 63.   These claims are identical to the conversion and replevin claims, asking this Court to award Konowaloff the Painting or its value, and like those claims, they are barred by the statute of limitations.[17]

The mere "label[ing of] their counterclaim as one for a declaratory judgment that they are the rightful owners of the Paintings" cannot obscure the fact "that whatever label the Defendants put on their claims, the action they describe is one for conversion." *Stuart & Sons*, 456 F. Supp.

---

[16] The request for injunctive relief, Answer and Counterclaim at 31, is not a cause of action, but a type of remedy. *Williams v. Walsh*, 558 F.2d 667, 670-71 (2d Cir. 1977) (injunctive relief does not constitute a cause of action); *Riverside Millwork Co., Inc. v. Pahl*, 2006 WL 224174 at *9 (Conn. Super. 2006) (holding that a "claim for injunctive relief is not" a "cause of action.").

[17] In fact, the law bars him from adding a quiet title claim to a replevin claim. *See infra* Pt. II.A.

2d at 343.  In *Stuart & Sons*, the court rejected what it described as "opportunistic pleading" by the defendants.  *Id.* (capitalization and italicization omitted).  The defendants had sought to evade the statute of limitations that applied to their claim that the paintings had been converted. But the court held that it would not allow the defendants to make "a mockery of the statute of limitations through creative labeling in cases where, as here, legal and equitable claims co-exist." *Id.*  To prevent that, the court focused "on the substance of the claim as opposed to its form," and withheld the equitable remedy because the "applicable statute of limitations bars the concurrent legal remedy.  Accordingly, although the Defendants' counterclaim is labeled as one seeking declaratory relief, in substance it is a claim for conversion and will be construed as such." *Id.* (internal citations omitted); *see also Town of Orangetown v. Gorsuch,* 718 F.2d 29, 41-42 (2d Cir. 1983) (noting that if a claim for declaratory relief can be resolved through another form of action that has a specific limitations period, the specific period will govern); *Pottinger v. Pottinger*, 2001 WL 1285387 at *1 (Conn. Super. Oct 10, 2001) (because a claim to quiet title on personal property under C.G.S. § 47-31 is based on the underlying tort of conversion, the statute of limitations that applies to conversion, C.G.S. § 52-577, likewise applies to the quiet title claim).[18]  Konowaloff's claims for declaratory relief and quiet title, like the defendants' claims in *Stuart & Sons*, are duplicative of his claim for conversion, and are similarly barred under the statute of limitations applicable to the conversion claim.

> 4.    ***CUTPA.***  CUTPA requires that claims be brought within three years of the occurrence of the alleged wrongful conduct.  C.G.S. § 42-110g(f).  As with most of

---

[18] *See generally Caminis v. Troy*, 112 Conn. App. 546, 557-58 (2009) ("Whether the staleness of the claim and the prolonged sleep of the plaintiffs be called laches or something else is not of controlling importance when equitable principles are within the court's discretion to consider, even if laches in the ordinary legal acceptation of the term is not strictly applicable.") (internal quotation marks omitted).

Connecticut's common law torts, the only date that matters is the date of the alleged wrongful conduct; neither the date of the injury that flows from the alleged wrongful conduct nor the date of the claimant's discovery of the alleged wrong plays any role in the limitations inquiry. *Id.*; *see also Fichera v. Mine Hill Corp.*, 207 Conn. 204, 209-17 (1988) (CUTPA statute of limitations period runs from date of alleged wrongful conduct).

Konowaloff alleges that Yale's "possession and display of the Painting" constitute CUTPA violations, Counterclaim ¶ 57, as do Yale's loans of the Painting to other museums, *id.* ¶ 58. Yet he admits that Yale possessed and displayed the Painting beginning in 1961, Compl. ¶ 34; Answer ¶ 34, and that Yale began lending it by 1984. Compl. ¶¶ 45, 48; Answer ¶¶ 45, 48. In short, the alleged CUTPA violations occurred at least a quarter century ago, and the statute of limitations has long since run.

Konowaloff also alleges that Yale violated CUTPA by "acting in concert with Mr. Clark to avoid public scrutiny of the stolen art," that Yale retained "the Painting even though it knew or should have known the Painting was illegitimately confiscated," and that it did not contact Morozov's heirs "to notify them that Yale had come into possession of the Painting." Counterclaim ¶ 59. He also acknowledges that Yale received the Painting as a bequest from Clark in 1961, Counterclaim ¶ 8 ("When the bequest occurred in 1961 . . ."); *see also* Answer ¶ 3 ("Admit that Yale came into possession of the Painting following Mr. Clark's death."). In short, he admits that all of these alleged wrongs occurred far more than three years before the counterclaim was brought.

### 5. *No tolling doctrine forestalls the statute of limitations.*

Konowaloff's pleadings intimate that the counterclaims' lateness should be forgiven due to fraudulent concealment, equitable estoppel and a continuing course of conduct, but he has not alleged facts that, if proven, could establish any of those tolling doctrines.

**Fraudulent concealment.** Konowaloff makes several assertions of concealment. *See* Answer ¶¶ 35-49 ("Insofar as Yale concealed the Morozov provenance, Yale furthered publication of incomplete provenances that concealed confiscation"); Counterclaim ¶ 9 ("Yale concealed reference to the Morozov provenance in any of its publications or displays of the Painting."); *id.*, ¶ 53 (alleging "Yale's receipt and concealment of the true legal ownership, title and provenance of the Painting"). These are far from enough.

Fraudulent concealment requires the concealer's (1) "actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action"; (2) the concealer's "intentional concealment of these facts" from the party with the cause of action; and (3) that the concealer's "concealment of the facts [was] for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action." *Bartone v. Robert L. Day Co.*, 232 Conn. 527, 533 (1995); *see also Connell v. Colwell*, 214 Conn. 242, 251 (1990) ("The actions of the defendant must be directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute.") (internal quotation marks omitted).

Konowaloff has not pleaded – and could not, consistent with Fed. R. Civ. P. 11 – any of the three: that Yale had actual knowledge of the facts necessary to establish his cause of action, that Yale intentionally concealed facts, or that Yale concealed facts in order to delay Konowaloff's lawsuit past the expiration of the statute of limitations. The lack of any of these three required allegations of knowledge and intent – Yale's actual knowledge that Konowaloff

and his predecessors had a cause of action, Yale's intent to conceal, or Yale's intent to delay a filing of the claim – makes tolling by fraudulent concealment impossible as a matter of law.

Even setting aside knowledge and intent, the allegations of fraudulent action are insufficiently pleaded. Fraud must be pleaded with "particularity" under Fed. R. Civ. P. 9(b); *see 389 Orange St. Partners v. Arnold*, 179 F.3d 656, 662 (9th Cir. 1999) (holding that the heightened pleading requirements of Rule 9(b) applies to claims of fraudulent concealment under C.G.S. § 52-595). A complaint of fraud "must (1) detail the statements . . . that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements . . . were made, and (4) explain why the statements . . . are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996). A complaint that merely asserts the "gist" of an alleged fraud "falls far short of the requirements of Fed. R. Civ. P. 9(b), and must be dismissed." *Olsen v. Pratt & Whitney Aircraft, Div. of United Technologies Corp.*, 136 F.3d 273, 275-76 (2d Cir. 1998). Though an allegation of fraudulent concealment requires it, Konowaloff says nothing about the who, when, where and why of the alleged fraud. *See* Counterclaim ¶ 53 (asserting broadly that Yale concealed "ownership, title and provenance of the painting"); Answer ¶¶ 35-49 (asserting broadly that Yale "concealed the Morozov provenance"); Counterclaim ¶ 9 ("Yale concealed reference to Morozov provenance in any of its publications or displays of the Painting.").

The Counterclaim also does not plead the due diligence required for any finding of fraudulent concealment. *See Mountaindale Condominium Assn., Inc. v. Zappone*, 59 Conn. App. 311, 323 (2000) (claimant who could have discovered the alleged wrong with due diligence cannot toll the statute of limitations). Konowaloff admits that numerous publications reproduced the Painting, in many languages around the world, some of which attributed ownership to Yale

and explicitly noted the Painting's provenance. *See supra* at 5-7. He concedes that Yale's possession of the Painting, and its bequest to Yale from Clark, have been widely reported on the Internet. *Id.* at 7-8. He acknowledges that in 1993, his father and predecessor-in-interest brought suit in a French court, seeking an injunction to impound paintings nationalized from Morozov, Compl. ¶ 87; Answer ¶ 87, but admits that neither he nor any of their predecessors-in-interest ever brought any legal action claiming ownership to *The Night Café* during the ninety years since his great-grandfather possessed it. Compl. ¶¶ 90, 101; Answer ¶¶ 90, 101. Though he alleges that in 2002 he actually began an "exhaustive effort" to document the inventory of Ivan Morozov, he claims he did not "discover" the Painting for six years – until 2008 – when he finally got around to contacting Yale University. Counterclaim ¶ 15. With any modicum of due diligence, Konowaloff would have discovered that the Painting was in Yale's possession and that Yale asserted ownership over it. He would have discovered it if he had reviewed any of the countless books and publications (many of them published in French) containing this information. Compl. ¶¶ 34-49; Answer ¶¶ 34-49; *see also* Exhs. A-1-27, 30-33. For years, he would have discovered it if he typed "*The Night Café*" into a Google search. Compl. ¶ 50; Answer ¶ 50.[19]

**Equitable estoppel.** Konowaloff asserts that the statute of limitations is "subject to equitable tolling because Mr. Konowaloff did not discover that Yale had possession of the

---

[19] Konowaloff also invokes "equitable tolling." *See* Answer Fifth Affirmative Defense, at 15. Neither the Connecticut Supreme Court nor the Connecticut Appellate Court has ever recognized such a doctrine. To the extent that the phrase appears in trial court decisions construing Connecticut law, it appears to be a description of how the fraudulent concealment doctrine operates – not a separate doctrine. *See Chien v. Skystar Bio Pharmaceutical Co.*, 2009 WL 1606451, at *7, *9 (D. Conn. June 8, 2009) (discussing "the equitable tolling provision found in Conn. Gen. Stat. § 52-595," the fraudulent concealment statute). In any event, Konowaloff's invocation of "equitable tolling" fails for the same reasons that his invocation of fraudulent concealment fails.

21

Painting until 2008 and had no reason to know that Yale was either in possession of the Painting or claimed ownership thereto."  Answer at 15 (Fifth Aff. Def.); *see also id.* (Fourth Aff. Def.) ("The doctrine of estoppel in all forms bars Yale's claim that it is the owner of the Painting."). This assertion fails for the same reasons as the fraudulent concealment assertion.

"There are two essential elements to an estoppel[:] the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done." *Morris v. Costa*, 174 Conn. 592, 599 (1978) (finding equitable estoppel where defendant repeatedly told plaintiffs that a contractual dispute was being resolved, and discouraged plaintiffs from retaining a lawyer, then when the statutory period expired, abruptly claimed that the contract had been breached).  In the statute of limitations context, equitable estoppel is primarily "invoked in cases where the defendant misrepresented the length of the limitations period or in some way lulled the plaintiff into believing that it was not necessary for him to commence litigation."  *Cerbone v. ILGWU*, 768 F.2d 45, 50 (2d Cir. 1985); *see also Gallop v. Comm'l Painting Co.*, 42 Conn. Supp. 187, 195 (1992) (noting that Connecticut law uses the same principle).  Konowaloff has not alleged (and could not) that Yale lulled him and his predecessors-in-interest into believing that they need not commence litigation, let alone that they relied on a misrepresentation by Yale in delaying (by decades) their initiation of suit.

Nor has he alleged facts that could support the finding of due diligence necessary for any finding of equitable estoppel.[20]  Konowaloff admits that he did not "undert[ake] an exhaustive

---

[20] *See, e.g., Reinke v. Greenwich Hospital Assn.*, 175 Conn. 24, 28, 392 A.2d 966 (1978) (*quoting Pet Car Products, Inc. v. Barnett*, 150 Conn. 42, 54 (1962) and *Linahan v. Linahan*, 131 Conn. 307, 327 (1944)) ("It is the burden of the person claiming the estoppel to show that he

effort aimed at documenting the inventory" of property nationalized from Ivan Morozov until January 2002, Counterclaim ¶ 15. No one could reasonably conclude that the 84-year delay by Konowaloff and his predecessors-in-interest constituted due diligence.

*Continuing course of conduct.* Konowaloff asserts that "Yale's continued possession constitutes continual and ongoing wrongful conduct with regard to its unauthorized assumption and exercise of ownership over *The Night Café*." Counterclaim ¶ 40. He may mean to invoke the "continuing course of conduct" tolling doctrine, but it has no application on the pleaded facts.

The doctrine does not apply to a single ongoing wrong. It applies only to "the breach of a duty that remained in existence after commission of the original wrong[.]" *Connell v. Colwell,* 214 Conn. 242, 254 (1990) (internal quotations and citations omitted). The breached duty can come from only two sources: "either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Id.* at 255; *see also Fichera,* 207 Conn. at 209.

The Connecticut Supreme Court has found a "special relationship" that triggers the doctrine only in the doctor-patient and attorney-client relationship, and only where these relationships are ongoing. *See e.g., Martinelli v. Fusi,* 290 Conn. 347 (2009) (holding that termination of doctor-patient relationship ended any continuing course of conduct); *DeLeo v. Nusbaum,* 263 Conn. 588, 597 n. 4 (1988) (limiting its holding to "cases in which an attorney is alleged to have committed malpractice during the course of litigation."). Konowaloff does not allege any "special relationship" between himself and Yale.

_____

exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge.") (internal punctuation omitted); *see also Gallop v. Commercial Painting Co.,* 42 Conn. Sup. 187, 192 (1992) ("Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.") (internal quotation marks omitted.).

The Connecticut Supreme Court has found a continuing course of conduct due to "later wrongful conduct of a defendant related to a prior act" only in the products liability context. *See Giglio v. Connecticut Light and Power Co.,* 180 Conn. 230 (1981) (though defective furnace was sold outside limitations period, seller continued to repair the furnace and address complaints during the limitations period); *see also Handler v. Remington Arms Co.*, 144 Conn. 316, 321 (1957) (defendant had ongoing duty to warn that the products, if defective, could be dangerous). The doctrine does not apply to every alleged wrong that has not been righted. *See Rosenfeld v. Rogin*, 69 Conn. App. 151, 162 (2002) (mere non-remedying of initial wrong insufficient to invoke doctrine); *Bellemare v. Wachovia Mortgage Corp.*, 94 Conn. App. 593, 609 (2006) (same) (holding that "defendant's continued failure to execute and deliver a release" required by a contract was "a single omission and not an ongoing or recurring wrongful act").

If the continuing course of conduct doctrine applied to every alleged wrong that had not been righted, the rule would eviscerate the statute of limitations for conversion. No action for an allegedly wrongful possession would ever be time-barred, as a claimant could simply assert that the possessor continued his course of wrongful possession. That is not the law. *D'Occhio v. Connecticut Real Estate Commission*, 189 Conn. 162, 182 (1983) (statute of limitations for conversion is three years under C.G.S. § 52-577). Konowaloff's allegation that Yale wrongfully converted the Painting in 1961 asserts a single wrong, forty-eight years old. The continuing course of conduct doctrine does not apply.

**B.      The Act of State doctrine bars all of the counterclaims**

At the heart of all of Konowaloff's counterclaims is the contention that Russia did not obtain good title when it nationalized the Painting. Because Russia did not obtain good title, he argues, Yale's title is defective, and Yale's acceptance and retention of the Painting amount to

24

various torts.  If Konowaloff cannot establish that Russia did not obtain good title, then he cannot show any flaw in Yale's title,[21] and his claims all fail.[22]  As this section shows, the Act of State doctrine requires that Russia's nationalization of the Painting be deemed valid.

The Act of State doctrine provides that "acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid" by U.S. courts.  *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  The Supreme Court has repeatedly applied the doctrine to nationalizations of property, including those effected by the RSFSR – Russia – in 1918, the year that it nationalized the Morozov collection.  *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964) (Cuban expropriation of assets); *United States v. Belmont*, 301 U.S. 324 (1937) (1918 decrees by the RSFSR); *United States v. Pink*, 315 U.S. 203 (1942) (same).  Lower courts similarly have not hesitated to reject lawsuits asking them to pass on the validity of foreign governments' expropriation orders.  *See, e.g., Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 77 (2d Cir. 1977), cert. denied, 434 U.S. 984 (1977) (declining to judge the validity of Libya's seizure of plaintiff's property); *Credit Suisse v. U.S. Dist. Court*, 130 F.3d 1342, 1347-48

---

[21] "A purchaser of goods acquires all title which his transferor had or had power to transfer[.]" C.G.S. § 42a-2-403; *see also Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.,* 2001 WL 1657237 (N.Y. Sup. Sept. 28, 2001).

[22] Konowaloff's conversion and related claims necessarily require, *inter alia*, proof of some infirmity in Yale's title.  *Falker v. Samperi*, 190 Conn. 412, 420 (1983) (conversion claimant must meet burden of proving ownership of property); *Discover Leasing, Inc. v. Murphy*, 33 Conn. App. 303, 309 (1993) (conversion and statutory theft require proof that property "belonged to" plaintiff); *M. Itzkowitz & Sons, Inc. v. Santorelli*, 128 Conn. 195, 198 (1941) ("The plaintiff in replevin must prevail by the strength of his title . . . ."); C.G.S. § 47-31(b) (same for quiet title).  So does his CUTPA claim.  *See* Counterclaim ¶ 59 ("Yale engaged in unfair and deceptive acts or practices by, among other things: 1) acting in concert with Mr. Clark to avoid public scrutiny of the stolen art; 2) retaining the Painting even though it knew or should have known the Painting was illegitimately confiscated from Ivan Morozov; and 3) not contacting the heirs and descendants of Mr. Morozov to notify them that Yale had come into possession of the Painting[.]").

25

(9th Cir. 1997) (Act of State doctrine barred claims because they would "require a United States court to question the validity of [Swiss] freeze orders").

Konowaloff concedes, as he must, "the general rule that nationalizations will not be questioned by courts of another country." Counterclaim ¶ 14. He seeks to avoid the fatal application of that general rule to his counterclaims on three grounds: (1) that the RSFSR was "not . . . recognized by the United States at the time of the taking," Counterclaim ¶ 19; (2) that "the RSFSR is not an extant regime or government," *id.*; and (3) that "an exception is carved" from the Act of State doctrine for "cultural property." Counterclaim ¶ 14.[23]  None of these contentions has any merit.

The Supreme Court's decisions in *Belmont* and *Pink* quickly dispose of Konowaloff's first argument. There, as here, property owners challenged the RSFSR's 1918 nationalization decrees.[24]  Although the United States had not recognized the Soviet government at the time of the nationalizations, the Supreme Court refused to review their legality, explaining that as soon as "the President recognized the Soviet government and normal diplomatic relations were established . . . [t]he effect of this was to validate, so far as this country is concerned, *all acts* of the Soviet government here involved *from the commencement of its existence.*" *Belmont*, 301 U.S. at 330 (emphasis added); *accord Pink*, 315 U.S. at 223; *see also Oetjen v. Central Leather Co.*, 246 U.S. 297, 303-03 (1918) (refusing to question the validity of property seizures by revolutionary forces during Mexican civil war because "when a government which originates in

---

[23] By "cultural property," Konowaloff presumably means art, rather than objects connected to a particular nation's history. It is undisputed that *The Night Café* was painted in France by a Dutchman, was later bought by a Russian, and still later resided in the United States.

[24] The decrees at issue in *Pink* were dated November 28, 1918, March 4, 1919, and November 18, 1919. *See Pink*, 315 U.S. at 217-218 n.2 & n.3. The decree challenged in *Belmont* was dated June 28, 1918. *See United States v. Belmont*, 85 F.2d 542, 543 (2d Cir. 1936), *rev'd by* 301 U.S. 324 (1937).

revolution or revolt is recognized by the political department of our government as the de jure

government of the country in which it is established, such recognition is retroactive in effect and

validates all the actions and conduct of the government so recognized from the commencement

of its existence."); *Ricaud v. Am. Metal Co.*, 246 U.S. 304 (1918) (same); *Salimoff v. Standard

Oil Co.*, 262 N.Y. 220, 186 N.E. 679 (1933) (1917 RSFSR nationalization decree effective to

pass title to oil within Russia despite fact that USSR was not yet recognized by the U.S.).[25]

    Konowaloff's second contention – that the Act of State doctrine is inapplicable

"[b]ecause the RSFSR is not an extant regime or government," Counterclaim ¶ 19 – fares no

better.  To be sure, *Sabbatino* recognized that "[t]he balance of relevant considerations may . . .

be shifted if the government which perpetrated the challenged act of state is no longer in

existence." 376 U.S. at 428.  Konowaloff does not deny that the Russian Federation is the

successor to the Russian Socialist Federated Soviet Republic.  But even if he did, and if the

"balance of relevant considerations may" thus "be shifted," it is beyond dispute that "[i]f

adjudication would embarrass or hinder the executive in the realm of foreign relations, the court

should refrain from inquiring into the validity of the foreign state's act." *Bigio v. Coca-Cola Co.*,

239 F.3d 440, 452 (2d Cir. 2001) (quotation marks omitted); *accord Sabbatino*, 376 U.S. at 423.

In this case, accepting Konowaloff's invitation to declare the RSFSR's nationalizations "simply

an act of theft," Counterclaim ¶ 4, would hinder this country's relations both with Russia and

with other former and current communist regimes.

    The Russian government maintains the validity of its title to artwork obtained through the

same nationalization decrees challenged here, and held since that time in Russian museums.  As

---

[25] *Cf.* Restatement (Third) of the Foreign Relations Law of the United States § 205(3) (1987)
("[C]ourts in the United States ordinarily give effect to acts of a regime representing an entity not
recognized as a state, or of a regime not recognized as the government of a state, if those acts
apply to territory under the control of that regime and relate to domestic matters only").

Konowaloff admits, Russia possesses and displays many works that were nationalized from Morozov's collection. Compl. ¶ 81; Answer ¶ 81. And it has consistently defended against attempts by heirs of Morozov and others to reclaim possession of those pieces: as recently as December 2007, when Pierre Konowaloff and Andre-Marc Delocque-Fourcaud (a descendant of Morozov's contemporary, Sergei Shchukin) threatened to sue to recover pictures loaned by Russia to the Royal Academy in London, Russia asked that the exhibition be delayed until the United Kingdom enacted a statute immunizing the paintings from third-party seizure. Compl. ¶ 82; Answer ¶ 82; *accord* Compl. ¶ 87; Answer ¶ 87 (discussing Konowaloff's father's 1993 lawsuit against the Russian Federation, the state-owned Pushkin Museum of Fine Arts in Moscow, the Hermitage Museum, and the Pompidou Center in Paris, as well as a similar suit by Shchukin's heirs). Indeed, according to the April 2008 *ArtNews* story cited by Konowaloff in paragraph 7 of his Counterclaim, in 2003 "Mikhail Shvydkoi, head of the Russian Federal Agency for Culture and Cinematography, . . . told the press that the demands of the Shchukin and Morozov heirs for compensation [for expropriated artwork] had no legal validity."[26]

　　Similarly, just last year the Russian government "energetic[ally] defen[ded]" a lawsuit seeking the return of a collection of "religious books, manuscripts, and documents" seized even earlier "during the October Revolution of 1917." *See Agudas Chasidei Chabad v. Russian*

---

[26] K. Akinsha and G. Kozlov, Fighting for Their Rights, *ArtNews* (April 2008), *available at* http://www.artnews.com/issues/article.asp?art_id=2474 (discussing the Russian Federation's response to the filing of *Delocque-Fourcaud v. Los Angeles County Museum*, No. 03-cv-05027-R-CT (C.D. Cal. 2003), a lawsuit brought by the Shchukin and Morozov heirs' seeking seizure of paintings on loan from Russia's Pushkin Museum). Konowaloff incorporated this *ArtNews* piece by reference into his Counterclaim. *See* Counterclaim ¶ 7; *see also supra* n.4 (document referenced in pleading may be relied on in motion to dismiss without converting it to summary judgment). He asserts elsewhere that Russia is analyzing the legality of later sales of nationalized artwork, *see* Answer ¶ 4, but he does not assert that Russia has in any way retreated from its position – held since 1918 – that the confiscations of art were legal.

*Federation*, 528 F.3d 934, 938, 954 (D.C. Cir. 2008).[27]  The D.C. Circuit, noting the Russian

Federation's reluctance to return the nationalized property, did not find that the change in regime

from the USSR to the Russian Federation stripped Russia of the Act of State defense.  *Id.* at 953.

Leaving resolution of the matter to the district court on remand, the D.C. Circuit made plain that

"while no one doubts that the collapse of the Soviet Union has entailed radical political and

economic changes," the courts are not qualified to engage in "political evaluation of the

character of the regime change itself," and that questioning the validity of the acts over the

Russian Federation's "energetic defense of the lawsuit" would "entail just the implications for

foreign affairs that the doctrine is designed to avert."  *Id.* at 954.[28]

---

[27] Since then, the Russian government has taken an even stronger position.  Last month, on June
26, 2009, Russia filed a "Statement . . . with Respect to Further Participation" in which it
declared that it "views any continued defense before this Court and, indeed, any participation in
this litigation as fundamentally incompatible with its rights as a sovereign nation." *Agudas
Chasidei Chabad v. Russian Federation*, Case No. 1:05-CV-01548-RCL, Docket # 71 at 2.  It
attached to its statement a "formal diplomatic note" that it had sent to the United States embassy
in Moscow.  *Id.*  The formal diplomatic communication noted that the literature collections that
the plaintiff sought had been nationalized "[i]n accordance with the Decree of the Council of
People's Commissars (the Government) of the Russian Soviet Federative Socialist Republic
dated April 4, 1919," and asserted that the collections "constitute unalienable state property of
the Russian Federation." *Id.* (formal diplomatic communication attached as exhibit to *Agudas
Chasidei Chabad*, Docket # 71).  The communication also stated that "[u]nder the law of the
Russian Federation and international law," the collections "constitute[] the property of the
Russian Federation as a successor to the Union of Soviet Socialist Republics," and that the
collections "were transferred into state ownership as a result of nationalization, i.e., by virtue of
an 'act of state.'" *Id.*

[28] The Russian government's continued defense of its title to nationalized property distinguishes
this case from the few cases in which courts have found an intervening change in government to
weigh against application of the Act of State Doctrine.  *See Bigio*, 239 F.3d at 453 (Act of State
doctrine unnecessary to protect foreign relations where the current Egyptian government had
repudiated the challenged nationalization and expressly ordered the return of the disputed
property to plaintiffs); *Republic of the Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986)
(Act of State doctrine inapplicable where current Philippine government itself sought to recover
illegal appropriations by deposed regime); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130
(E.D.N.Y. 2000) (doctrine inapplicable where current French government had "rejected and
revoked" challenged acts of World War II-era Vichy regime).

The same would be true here.  It makes no difference that Russia is not a party to this lawsuit.  A ruling by this Court that the 1918 Decree was illegal under international law and failed to vest title to *The Night Café* in the RSFSR and its successor the USSR, would necessarily impugn the current Russian government's title to all of the works that it has defended in France, the U.K., and the U.S.   It would inevitably "touch . . . on national nerves," *Sabbatino* 376 U.S. at 428, and strain U.S.-Russian relations.  Nor would the fall-out be limited to U.S. relations with Russia.  As *Sabbatino* observed, passing judgment on communist nationalizations pits "the social ideologies of those countries that favor state control of a considerable portion of the means of production" against "those that adhere to a free enterprise system," and therefore "[i]t is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations." *Id.* at 430.  Today no less than when *Sabbatino* was decided, the United States strives to maintain productive relations with countries having very different views on the proper balance of private and public ownership; now, as then, "[i]t may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the general assent of civilized nations . . . [and] [w]e cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all civilized nations." *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 102 (D.D.C. 2005), *aff'd* 452 F.3d 883 (D.C. Cir. 2006) (quotation marks omitted).[29]

---

[29] The problems that would be engendered by pronouncing *The Night Café* "stolen art," Counterclaim ¶ 11 – and thereby impugning Russia's own title to paintings acquired under the same circumstances and currently housed in Russian museums – are not limited to the political sphere.  As the Supreme Court observed in *Sabbatino*, invalidating title obtained through expropriation decrees would create serious economic difficulties in our globalized world, as it would "render uncertain titles in foreign commerce, with the possible consequences of altering the flow of international trade." *Sabbatino*, 376 U.S. at 433.  Ninety years after the Soviets

Konowaloff seeks to minimize this problem by asserting that his claim of void nationalizations extends only to "cultural property," Answer ¶ 3, "for which an exception has been carved to the general rule that nationalizations will not be questioned by the courts of another country." Counterclaim ¶ 14.   There is no such exception.  As a practical matter, there is no principled way to limit a ruling in Konowaloff's favor to "cultural property."  Konowaloff relies on the 1907 Hague Convention (IV) Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631 ("Hague 1907" or "Hague Convention") for the proposition that the Decree violated contemporary international law.  But as his own pleadings aver, Hague 1907 not only "states that 'all seizure of . . . works of art and science is forbidden'"; it also, much more broadly, "provides that '[p]rivate property cannot be confiscated.'" Counterclaim ¶ 11 (quoting Hague 1907, arts. 56 and 46, respectively).[30]  If this Court were to determine that Hague 1907 prohibited nationalization of cultural property, logic would require also concluding that Hague 1907 prohibited nationalization of all property, with the concomitant economic consequences.

No court has recognized a "cultural property" exception to the Act of State doctrine.  To the contrary, courts considering claims virtually identical to Konowaloff's have refused to sit in judgment on the RSFSR's nationalization of its own citizens' art collections.  *See Stroganoff Scherbatoff v. Weldon*, 420 F. Supp. 18 (S.D.N.Y. 1976) (refusing to adjudicate claims to Van Dyck painting and Houdon bust nationalized by the RSFSR between 1918 and 1921 and eventually sold to the Metropolitan Museum of Art in New York); *Princess Paley Olga v. Weisz*,

---

nationalized vast swathes of private property in Russia, declaring invalid the titles currently held to that property would have obvious disruptive consequences for the global economy.

[30] Konowaloff also invokes several treaties that post-date the Decree by at least three decades and therefore cannot support the claim that the Decree violated international law in force in 1918.

1 K.B. 718, 725 (King's Bench, 1929) (British Court of Appeal refused to adjudicate Russian princess' claims to art objects sold by the USSR to art collector in 1928 on the grounds that "[o]ur Government has recognized the present Russian Government as the de jure Government of Russia and our Courts are bound to give effect to the laws and acts of that Government so far as they relate to property within that jurisdiction when it was affected by those laws and acts."); *see also* William H. Reeves, *The Act of State Foreign Decisions Cited in the* Sabbatino *Case*, 33 Fordham L. Rev. 599, 669 (1964-65) (explaining that a German court rejected the claims of Prince Dabischa-Kotormaiez to certain works of art nationalized by the Soviets and later auctioned in Berlin, because German law "'does not permit us to criticize an act of sovereignty that the government of a foreign state takes against one of its citizens . . . [or] to refuse to recognize the effect of transfer of ownership effected on Russian territory, in conformity with the provisions of Russian law.'") (quoting *Prince Dabischa-Kotromaiez v. Société Lepke*, Tribunal of Berlin, Nov. 1, 1928, 56 Clunet 184, 184-85 (1929) (Ger.)).

## C.    Russia's nationalization did not violate international law.

Under the Act of State doctrine described above, Konowaloff cannot ask this Court to examine the validity of the RSFSR's nationalization of *The Night Café* under international law. *See Sabbatino*, 376 U.S. at 428 (holding that courts may "not examine the validity of a taking of property within its own territory by a foreign sovereign . . . even if the complaint alleges that the taking violates customary international law.").[31]   But even if the inquiry were proper,

_____

[31] The Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), overrode this aspect of the *Sabbatino* decision, but only with respect to state takings in violation of international law effected after January 1, 1959. *See id.* ("[N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other rights to property is asserted by any party . . . based upon . . . a confiscation or other taking *after January 1, 1959*, by an act of that state in violation of the principles of international law") (emphasis added).

Konowaloff cannot identify any principle of international law violated by the 1918 nationalization.

While expropriation by a state of the private property of *another state's* citizen violates international law, *Restatement (Third) of Foreign Relations* § 712 (1987) (emphasis added), "confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law." *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966), *aff'd mem.*, 375 F.2d 1011 (2d Cir.), *cert. denied*, 389 U.S. 830 (1967). Courts nationwide have reiterated that principle. *See Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1294 (11th Cir. 2001) ("[W]hen a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law."); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."); *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1397 (5th Cir. 1985) ("[T]he taking by a state of its national's property does not contravene the international law of minimum human rights."); *Cassirer v. Spain*, 461 F. Supp. 2d 1157, 1165 (C.D. Cal. 2006) ("[E]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."); *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 102 (D.D.C. 2005) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.") (quotation marks omitted); *Presbyterian Church of Sudan v. Talisman Energy*, 244 F. Supp. 2d 289, 324 (S.D.N.Y. 2003), *appeal pending* No. 07-0016 (2d Cir. argued Jan. 12, 2009) ("[G]enerally speaking, confiscation of property without just compensation does not violate the law of nations."); *Tachiona v. Mugame*, 234 F. Supp. 2d 401, 440 (S.D.N.Y.

2002) ("[There is] no authority . . . to support a determination that the state seizure of property of its own nationals without fair compensation . . . constitutes a violation of well-defined, universal and obligatory norms of international conduct."); *Bank Tejarat v. VarshoSaz*, 723 F. Supp. 516, 520 (C.D. Cal. 1989) ("[T]he taking by a government of the property of one of its citizens, located within its territory, does not constitute a violation of international law"); *Guinto v. Marcos*, 654 F. Supp. 276, 280 n. 1 (S.D. Cal. 1986) ("While there is no consensus on what constitutes a violation of the 'law of nations,' in one area there appears to be a consensus. A taking or expropriation of a foreign national's property by his government is not cognizable[.]"); *Jafari v. Islamic Rep. of Iran*, 539 F. Supp. 209, 215 (N.D. Ill. 1982) ("[T]he 'law of nations' does not prohibit a government's expropriation of the property of its own nationals."); *M. Salimoff & Co. v. Standard Oil Co.*, 186 N.E. 679, 682 (N.Y. 1933) ("According to the law of nations, [the U.S.S.R.] did no legal wrong when it confiscated the oil of its own nationals and sold it in Russia to the defendants.")

In short, "[i]t may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the general assent of civilized nations . . . a prerequisite to incorporation in the law of nations." *De Sanchez*, 770 F.2d at 1397 (quotation marks omitted). Because "we cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all 'civilized nations,'" *id.* (quotation marks omitted), it remains true that "[w]hat another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled." *United States v. Belmont*, 301

U.S. 324, 332 (1937).  Konowaloff attempts to avoid this fundamental principle in two ways, both of which are unavailing.

*First*, Konowaloff attempts to characterize RSFSR's nationalization of Morozov's private art collection as an instance of wartime plunder by an occupying army in violation of the laws of war as codified in Hague 1907.  *See* Counterclaim ¶ 11 ("[T]he RSFSR's taking violated international law . . . expressed by The Hague Convention (Regulations) Respecting the Laws and Customs of War on Land (1907) . . . [because] [t]he Bolsheviks were an occupying power at the time of the Morozov confiscation on territory where the Morozovs resided and which the Bolsheviks controlled during the civil war.").  This argument is meritless.

As discussed above, the Supreme Court had occasion to consider several challenges to the RSFSR's 1918 nationalization decrees.  In those cases, the Supreme Court consistently described the challenged acts as nationalizations by the Russian government, not acts of plunder by an occupying force.  *See Belmont*, 301 U.S. at 326 ("In 1918, the Soviet government duly enacted a decree by which it . . . nationalized and appropriated all of [the corporation's] assets."); *Pink*, 315 U.S. at 218 & n.2 (describing as laws passed in June 1918 by which "the commercial and industrial enterprises . . . within the boundaries of the Soviet Republic, together with all their capital and property" were declared "the property of the Republic" as "Russian decrees of nationalization.").  Konowaloff's radical re-characterization of the RSFSR's status contradicts even the dissent in *Pink*, which conceded that "[n]o one doubts that the Soviet decrees are the acts of the government of the Russian state which is sovereign in its own territory." 315 U.S. at 244 (Stone, J. dissenting).  As the British Court of Appeal explained, considering in 1921 the validity of the same RSFSR decrees, "[i]t may well be a question when first the struggling body attained such power that it was a government de facto . . . but here . . . since the beginning of

35

1918 the Soviet Republic has been the government de facto of Russia." *A.M. Luther v. James Sagor & Co.*, 3 K.B. 532, 557 (1921). The RSFSR was a state government nationalizing its citizens' property, not an occupying army plundering a foreign land.

Konowaloff's claim that the RSFSR nationalizations violated the law of war also fails because the law of war that he invokes – Hague 1907 – applies only to international armed conflicts between nations, not to internal conflicts such as the civil war that accompanied the Russian revolution. *See id.*, art. 2 ("The provisions contained in the Regulations referred to in Article 1, as well as in the present Convention, do not apply except between Contracting powers, and then only if all the belligerents are parties to the Convention.").[32] Thus, on the face of the treaty it is clear that the prohibitions against confiscation of private property that Konowaloff cites – Articles 46, 53, and 56 – only constrain the actions of one "contracting power" when it occupies the territory of another sovereign state during international armed conflict. *Id.* In the very year of the Decree in this case, another plaintiff tried to persuade the Supreme Court that a seizure of property by revolutionary forces in Mexico violated Hague 1907. The Supreme Court rejected that argument, explaining that "[t]he Hague Conventions are international in character, designed and adapted to regulate international warfare, and . . . they do not, in terms or in purpose, apply to a civil war." *Oetjen v. Central Leather Co.*, 246 U.S. 397, 301 (1918); *accord Sabbatino*, 376 U.S. at 417 (explaining that, "the [*Oetjen*] Court suggested that the rules of the [Hague] Conventions [of 1907] did not apply to civil war and that, even if they did, the relevant seizure [of hides from a Mexican citizen] was not in violation of them.").[33]

---

[32] A list of the Contracting powers to the 1907 Hague Convention is available on the website of the International Committee of the Red Cross at *http://www.icrc.org/ihl.nsf/WebSign?ReadForm&id=195&ps=P* (last viewed 07/22/09).

[33] In *Dreyfus v. Von Finck*, 534 F.2d 24 (2d Cir. 1976), *cert. denied*, 429 U.S. 835 (1976), the Second Circuit also rejected a claim that the Hague Convention "dealt with the expropriation by

Konowaloff attempts to avoid this limitation by claiming that "[under] customary international law applicable to any reading of the 1907 Hague Conventions, in the event of a civil war, opposing belligerents were and are to be treated as if they are separate states for the purposes of compliance with provisions of the rules of war, including prohibitions against the confiscation of cultural property." Counterclaim ¶ 11. Konowaloff cites no authority for the claim that it was true in 1918.

To the contrary, at the beginning of the twentieth century, "international law treated the two classes of conflict [civil war and conflicts between states] in a markedly different way: interstate wars were regulated by a whole body of international legal rules . . . [but] there were very few international rules governing civil commotion." *Prosecutor v. Dusko Tadic*, Case No. IT-94-1, Decision of Defence [sic] Motion for Interlocutory Appeal on Jurisdiction of Oct. 2, 1995, at ¶ 96 (International Criminal Tribunal for the Former Yugoslavia), *available at*

---

Germans of the property of German citizens," observing that that Convention only "attempted to impose standards of conduct for belligerent nations." 534 F.2d at 30. *Dreyfus* identifies another fatal flaw in Konowaloff's reliance on Hague 1907: "It is only when a treaty is self-executing . . . that it may be relied on for the enforcement of [private] rights." *Id.* Hague 1907 is not a self-executing treaty, and therefore does not "confer[] any private rights with regard to [expropriated] property which [a]re enforceable in American courts." *Id.*; *accord Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) ("International treaties are not presumed to create rights that are privately enforceable. . . . [T]he Hague Convention [Respecting the Law and Customs of War on Land] is not self-executing . . . ."); *see also Medellin v. Texas*, 128 S.Ct. 1346, 1356-57 (2008) (non-self-executing treaty provisions "are not domestic law" or "federal law" unless Congress passes implementing legislation); *id.* at 1357 n.3 ("[T]he background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.") (quoting Restatement (Third) Of The Foreign Relations Law Of The United States § 907 cmt. a (1986)); *Head Money Cases*, 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress."); *cf. Mora v. New York*, 524 F.3d 183, 192–93 (2d Cir. 2008) (treaty provides a "rule of decision" only when it "creates a right in an individual litigant that can be enforced in domestic proceedings by that litigant").

http://www.icty.org/x/cases/tadic/acdec/en/51002.htm.  It was only in the 1930s that that

distinction began to fade; by the time of the Spanish Civil War in the mid-1930s, "[s]tate practice

revealed a tendency to . . . apply certain general principles of humanitarian law, at least to those

internal conflicts that constituted large-scale civil wars." *Id.* ¶100.   In fact, due to "reluctan[ce]

to impose international obligations on States in connection with their internal affairs," it would

take until 1949 to achieve a treaty provision extending *any* protection in internal conflicts, and

even then only the most basic protections were accorded: those prohibiting inhumane treatment,

arbitrary detention, hostage taking, and "violence to life and person."  *See* International

Committee of the Red Cross, Commentary, IV Geneva Convention Relative to the Protection of

Civilian Persons in Time of War 26-29 (J. S. Pictet, ed., 1958);  Geneva Convention Relative to

the Protection of Civilian Persons in Time Of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S.

287, art. 3.  Thus, even in 1949, decades *after* the Decree, it remained fundamental that

"[p]roperty on the territory of the country in question is not protected even if it belongs to a

member of the opposing party, as neither Hague law nor the Geneva Conventions contain such a

provision." Gerhard Werle & Florian Jessberger, *Principles of International Criminal Law* 336

(Cambridge Univ. Press 2005).

* * *

Konowaloff claims his case is different because – even though a nation can nationalize all

other private property belonging to its citizens – "contemporaneous international law had carved

out a prohibition against confiscation of *cultural property* under the guise of nationalization."

Answer ¶ 3 (emphasis added); *see also* Counterclaim ¶¶ 4, 14. International law does not

distinguish between a sovereign's nationalization of *all other* property of its citizens and the

nationalization of the *cultural* property of its citizens, and Konowaloff's novel attempt to create such a distinction has no support.

As a preliminary matter, three of the four treaties that Konowaloff cites post-date the Decree by at least three decades and are therefore irrelevant to the claim that the RSFSR violated international law in 1918. *See* Counterclaim ¶¶ 13-14 (citing the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property); *id.* ¶ 12 (citing the 1949 Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War and the 1954 Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict).

The only contemporaneous international instrument cited in the counterclaim is Hague 1907. But, as explained above, Hague 1907 says nothing about the expropriation by a sovereign of the property of its citizens, *see supra* at 36,[34] and it extends no more protection to works of art than to any other private property. *Compare* Hague 1907, art. 56 ("[A]ll seizure of . . . works of art and science is forbidden") *with id.*, art. 46 ("Private property cannot be confiscated."). Accordingly, even in cases involving claims that foreign states violated international law by expropriating from their citizens cultural property such as collections of art and sacred manuscripts, courts have not hesitated to affirm that "expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law." *Cassirer v. Spain*, 461 F. Supp.2d 1157, 1165 (C.D. Cal. 2006) (holding that because plaintiff's grandmother was Jewish, and by Nazi law therefore not a citizen of Germany, the Act of State

---

[34] In fact, the Second Circuit has applied this principle even in the egregious circumstance of the Nazis' racially based expropriations. *Dreyfus*, 534 F.2d at 30-31 (holding that "violations of international law do not occur when the aggrieved parties are nationals of the acting state" and noting that international law was traditionally concerned "primarily with the relationship among nations rather than among individuals").

doctrine did not apply to the taking of a Pissarro painting); *accord Chabad*, 528 F.3d at 943

(agreeing with district court that, if the library had been the property of Soviet citizens when

seized by the RSFSR, there would have been no violation of international law, but reversing on

the grounds that "plaintiff's contention is that the worldwide Chabad organization, not any

Soviet citizen, owned the Library, creating at least a substantial and non-frivolous claim of a

taking in violation of international law."). There was no prohibition under international law

against a sovereign's nationalization of its citizens' purchased paintings in 1918. Absent the act

of state doctrine, it would be proper for this Court to dismiss the counterclaims because the

Decree violated no international law when enforced in 1918.[35]

## II.  Certain counts have additional infirmities beyond the three fatal flaws.

All counts of the counterclaim fail due to each of the three independent fatal flaws

explained above: the statute of limitations, the act of state doctrine, and the failure to state a

claim for any violation of international law by Russia that could impair Yale's title. Most of the

counts have additional fatal flaws beyond those three.

### A.  All claims except conversion and replevin must be dismissed.

Connecticut law is clear that a plaintiff who chooses to bring a replevin action cannot

append to the action any claims other than conversion. "In an action for replevin, no cause of

action, except of replevin or for a conversion of the goods described in the writ of replevin may

---

[35] As the section above demonstrates, Russia's taking without compensation of its own citizen's property did not violate international law. But even if it did, there is no reason to think that a taking without compensation somehow creates a flaw in the title to the object taken – rather than a remedy against the government that took the property. Konowaloff takes issue with Russia's action in 1918, but instead of seeking recompense from Russia, he has chosen to sue Yale. Yet he cites no principle of the international law of remedies that would transform Russia's alleged wrong – an uncompensated governmental taking – into a title defect that runs with the object. By analogy, in U.S. constitutional law, a governmental taking without just compensation provides the person whose property was taken with a claim for just compensation; it does not cloud the title to the property.

be stated." C.G.S. § 52-522.[36]  If Konowaloff's replevin and conversion claims were not

dismissed, then all other claims would have to be dismissed.

The language of C.G.S. § 52-522 is plain and unambiguous, representing a direct

legislative choice on the election of remedies in this context.  *See* C.G.S. § 1-2z ("The meaning

of a [Connecticut] statute shall, in the first instance, be ascertained from the text of the statute

itself and its relationship to other statutes. If, after examining such text and considering such

relationship, the meaning of such text is plain and unambiguous and does not yield absurd or

unworkable results, extratextual evidence of the meaning of the statute shall not be

considered."); *see also see PJM and Associates, LC v. City of Bridgeport*, --- A.2d ----, 2009 WL

1564387, at **3-4 (Conn. June 16, 2009) (finding statutory language plain and unambiguous

where statute not "susceptible to more than one reasonable interpretation").

Courts have repeatedly applied the plain meaning of C.G.S. § 52-522, throwing out

claims other than conversion that plaintiffs impermissibly tack onto replevin claims.  *See*

*Angrave v. Oates*, 2004 WL 2595855 at *2 & n.4 (Conn. Super. Ct. 2004) (precluding contract

claim); *Rapuano v. Rapuano*, 2001 WL 1332431 at *1, (Conn. Super. Ct. Oct. 12, 2001) ("Since

General Statutes §§ 52-522 and 52-524 forbid the commingling of an action of replevin with any

other cause of action except conversion of the goods described in the writ, the parties may not

pursue other causes of action in this matter except those sounding in replevin or conversion. To

proceed otherwise would thwart the provisions of General Statutes §§ 52-522 and 52-524 merely

because the parties chose not to use the word replevin in their pleadings.") (internal footnotes

omitted) (precluding contract, quantum meruit, and unfair trade practices claims); *Burgos v.*

*National Auto Broker*, 5 Conn. L. Rptr. 63, 1991 WL 204356 at *1 (Conn. Super. Sept. 30, 1991)

---

[36] Claims for replevin in Connecticut are governed by statute.  *See generally* C.G.S. § 52-515 *et seq.*; *Cornelio v. Stamford Hospital*, 246 Conn. 45, 49 (1998).

(§ 52-522 precluded combining a breach of warranty claim with a cause of action "in the nature

of a writ of replevin"); *Wasmer v. Fabricating & Production Machinery Inc.,* 1991 WL 83999, at

\*1 (Conn. Super. Ct. Apr. 19, 1991) (under (§ 52-522, "plaintiff's complaint [went] beyond the

scope of an action of replevin" where he "alleged five causes of action.").

**B.      Konowaloff fails to state a CUTPA claim and lacks standing to bring one.**

Konowaloff alleges that Yale's acceptance of the Painting and its retention and display of

it afterward constitute unfair or deceptive acts actionable under CUTPA.  *See* Counterclaim ¶¶

57-59.  In particular, he claims that by displaying the Painting and occasionally lending it to

other non-profit museums, Yale interfered with Konowaloff's "business expectancies as the

rightful owner."  *Id.* ¶ 58.  Konowaloff lacks standing to make this claim, and the conclusory

pleading itself fails to state a claim under CUTPA.

Only plaintiffs involved in a business relationship with the defendant have standing to

bring a CUTPA claim.  Standing is limited to consumers, *see Jackson v. R.G. Whipple, Inc.*, 225

Conn. 705, 725-27 (1993), business competitors, *see McLaughlin Ford, Inc. v. Ford Motor Co.*,

192 Conn. 558, 566-67 (1984), or other persons with a business relationship with the defendant,

*see Macomber v. Travelers Property & Casualty Corp.*, 261 Conn. 620, 643 (2002) (solicitation

and entry into structured settlements funded by purchased annuities).  Absent any such

commercial relationship with the defendant, a plaintiff lacks standing to bring a CUTPA claim.[37]

Konowaloff pleads no such commercial relationship.

---

[37] *See In re Methyl Teriary Butyl Ether (MTBE) Products Liability Litigation*, 379 F. Supp. 2d
348, 385 (S.D.N.Y. 2005) (dismissing CUTPA claims because plaintiffs lacked "some type of
commercial relationship with the alleged wrongdoer such that the latter's unfair and deceptive
acts could adversely affect fair competition in that particular market"); *Connecticut Pipe Trades
Health Fund v. Philip Morris, Inc.*, 153 F. Supp. 2d 101, 113 n.13 (D. Conn. 2001) (dismissing
CUTPA claims by insurer against tobacco company for injuries from smoking, where there was
no "connection or nexus – business, consumer, competitor, commercial or otherwise – between

42

His pleading is also entirely conclusory.  He asserts that Yale interfered with his "business expectancies as the rightful owner," *id.* ¶ 58, but that statement does no more than reiterate a required element of the cause of action.  Under the federal rules, a complaint must do more than formulaically recite an element of a cause of action; it must contain facts that, if proven, would establish the elements.  *See Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 557-58 (2007) (holding that "a conclusory allegation . . . does not supply facts adequate to show illegality" and reiterating that "a district court must retain the power to insist upon some specificity in pleading").  "Threadbare recitals of the elements of the cause of action" do not save a claim from dismissal, as the Supreme Court held earlier this year.  *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555) (holding that "formulaic recitations of the elements" should be rejected because of their "conclusory nature.").

Konowaloff does not assert what sort of business he is in, let alone how Yale's receipt, display or lending of the Painting interfere with that business.  He does not allege that he owns a museum that competes with the Yale University Art Gallery.  He does not allege that he entered into a commercial relationship with the Gallery.  He does not allege that he has any sort of "business or commercial relationship" with Yale.

All he could possibly mean to assert is that if this Court ordered Yale to give him the Painting, he would do something with it: sell it, or lend it out for money.  But Konowaloff's un-pleaded desire (if he has one) to sell or lease the Painting does not give him standing under

---

the [plaintiff] health funds and the [defendant] tobacco industry"); *Rosenthal v. Ford Motor Co., Inc.*, 462 F. Supp. 2d 296, 312 (D. Conn. 2006) (plaintiff who received defective product as gift was not within class of persons CUTPA was meant to protect).  As the leading CUTPA treatise states, "a CUTPA claim may not be asserted against another party in the absence of a transactional, competitive or commercial relationship between the parties."  Robert M. Langer et al, *Connecticut Unfair Trade Practices, in* 12 CONNECTICUT PRACTICE SERIES, § 6.3 n. 27 (2003 & Supp. 2008) (citing dozens of cases over the past two decades).

CUTPA. It merely makes him a claimant to the property. Were it otherwise, all title litigation would transmute into CUTPA litigation.

The Connecticut Supreme Court rejected a similar argument in *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 156-58 (2005). In that case, a small airport trespassed onto neighboring property on which it had an aviation easement and then clear-cut trees there to improve takeoff and landing visibility. The neighbors, environmental organizations, brought a CUTPA claim asserting that they were "in the business of protecting natural resources" and "competing for the airspace that the trees had occupied." *Id.* at 157. The Court rejected the plaintiffs' broad interpretation of the meaning of "competition," finding that "[t]he relationship between the land trust defendants and the airport defendants cannot be characterized as competitive in any ordinary business sense." *Id.* "[B]efore the clear-cutting," the Court noted, "the relationship was merely one of neighboring landowners. After the clear-cutting, the relationship was one of landowner and trespasser." *Id.* The relationship of two parties with claims to the property – the landowner, and the airport with an aviation easement – could not be converted into a "business relationship" through the use of clever rhetoric. *Id.*

So too here. Konowaloff and Yale's only "relationship" is as co-claimants to the Painting's title. Before Konowaloff's claim, they had no relationship at all. Because they are not competitors, Konowaloff is not a customer of Yale, and the two share no "business relationship," the CUTPA claim must be dismissed.[38]

---

[38] Konowaloff's allegations also fail because a proper CUTPA claim "must arise out of the offenders' primary trade or business, not out of an incidental matter." *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 521 (2006); *see id.* at 523 (holding that "a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce," and dismissing claim premised on the sale of environmentally contaminated property, where this sale was "merely incidental to the defendants' sale and servicing of automobiles"); *Cornerstone Realty, Inc. v. Dresser Rand Co.*,

## C.   Konowaloff fails to state a claim for statutory theft.

Konowaloff claims that Yale committed statutory civil theft by accepting Clark's bequest

of the Painting.  Counterclaim ¶¶ 50-55.[39]  A plaintiff claiming civil theft must prove that he

owns the property, that the defendant deprived him of it, that the defendant did so intentionally,

and that the deprivation was unauthorized. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn.

20, 43, 47 (2000).  In short, he must prove all elements of conversion, plus the element of

wrongful intent.  *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418-19

(2007).

Konowaloff has failed to plead the required intent.  He offers vague and conclusory

assertions of intent, but the U.S. Supreme Court recently held that similarly vague assertions of

intent do not suffice to meet the notice pleading standard of the Federal Rules.  In *Ashcroft v.*

*Iqbal*, -- U.S. --, 129 S. Ct. 1937 (2009), the Court underscored two essential rules of federal

notice pleading.  "First, the tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice;" notice pleading "does not

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at

---

993 F. Supp. 107, 111-13 (D. Conn. 1998) (sale of property not part of defendants' primary trade
of manufacturing and industry); *Arawana Mills Co. v United Technologies Corp.*, 795 F. Supp.
1238, 1252 (D. Conn. 1992) (leasing of land incidental to defendants' business of repairing and
servicing aircraft engines); *Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 81 (D. Conn.
1994) (no viable CUTPA claim for conduct in leasing aircraft where defendants' main business
was providing overnight freight service).  Yale's alleged receipt of the Painting via bequest, *see*
Counterclaim ¶ 59, its occasional loan of the Painting to other non-profits and its display to the
public free of charge, *see id.*, ¶ 58; Compl. ¶ 6; Answer ¶ 6,  are not Yale's "primary trade or
business." *McCann Real Equities*, 93 Conn. App. at 523.  Yale's primary business is research,
scholarship, and the education of students.

[39] Konowaloff describes his claim as one for larceny.  Answer at 29.  The cause of action is
properly denominated as "statutory theft under § 52-564," and it "is synonymous with the crime
of larceny as defined in § 53a-119." *Certain Underwriters at Lloyd's, London v. Cooperman*,
289 Conn. 383, 409 n.26 (2008) (internal punctuation and citation omitted).

1949-50. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.   A pleading "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 555 ); *see also id.* ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Twombly*, 550 U.S. at 557).   A pleading must present "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation and quotation marks omitted).   Lest there be any doubt, the Court noted that a complaint which "pleads facts that are 'merely consistent with' a defendant's liability" does not adequately plead intent. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In *Iqbal*, plaintiffs alleged that two government officials had intentionally discriminated against Muslims in setting policies on the conditions of confinement in New York following the 9/11 attacks.   The officials allegedly "'knew of, condoned, and willfully and maliciously agreed to subject respondent to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin.'" *Id.* at 1944 (quoting complaint in *Iqbal*).   The Court described these averments as "conclusory . . . allegations" and "bare assertions" not warranting a presumption of truth. *Id.* at 1951.   While the remaining factual allegations were "consistent with" the unlawful conduct alleged, intentional discrimination was "not a plausible conclusion," in light of other "more likely" explanations. *Id.* at 1951-52.   Accordingly, the claim had to be dismissed.

The assertions of intentionality here are no better than in *Iqbal*.   The complaint offers "conclusory allegations" of Yale's intent to receive stolen property.   It asserts that "Yale engaged in a policy of willful ignorance," Counterclaim ¶ 8, that "Yale knew, or should have known, at the time it received the bequest and thereafter that they unlawfully acquired the stolen

46

masterpiece," Counterclaim ¶ 18, that "Yale's unquestioned acceptance of the Clark bequest amounted to 'art laundering' that involved the knowing receipt of stolen goods," Counterclaim ¶ 51, in what Konowaloff claims was "Yale's deliberate acquisition of suspect stolen art[.]" Counterclaim ¶ 11.  None of these bare assertions can be presumed true under *Iqbal*.

When the bare assertions are disregarded, the remaining allegations do not plausibly suggest Yale's intentional participation in the intentional receipt of stolen goods.  *See Iqbal*, 129 S. Ct. at 1950 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").  The only plausible reading of the averred facts is benign: Yale accepted the bequest and has kept and publicly displayed the Painting ever since because Yale believed – and continues to believe – that it is the Painting's true owner and lawful possessor.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss Counterclaims should be GRANTED.

### PLAINTIFF YALE UNIVERSITY

By:    /s/Jonathan M. Freiman
Jonathan M. Freiman (ct24248)
Tahlia Townsend (ct27687)
Amos E. Friedland (ct27989)
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 fax
jfreiman@wiggin.com
ttownsend@wiggin.com
afriedland@wiggin.com

*Attorneys for Yale University*

47

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2009, a copy of the foregoing document was filed electronically.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.   Parties may access this filing through the Court's CM/ECF system.

   /s/Jonathan M. Freiman
Jonathan M. Freiman

490\213\2239513.9